REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 939
September Term, 2014

ASSATEAGUE COASTAL TRUST, INC.

v.

ROY T. SCHWALBACH, ET AL.


Hotten,
Berger,
Arthur,

JJ.


Opinion by Arthur, J.


Filed:  July 2, 2015

The Board of Zoning Appeals for Worcester County granted a critical area variance authorizing landowner Roy T. Schwalbach to construct a pier or walkway across his private wetlands. The Circuit Court for Worcester County upheld the Board's decision after Assateague Coastal Trust, Inc. ("ACT"), a non-profit environmental advocacy organization, petitioned for judicial review. ACT now appeals from that judgment, and we also affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.       Property Subject to the Variance Request**

In 2003, Schwalbach purchased a subdivided property located at 12933 Old Bridge Road in West Ocean City. The property consists of five and one-half rectangular lots that were originally platted in the 1930s. The Worcester County zoning classification for the property is "R-3 Multi-Family Residential."

The property sits immediately north of Old Bridge Road and immediately south of the shoreline of an unnamed tributary of the Sinepuxent Bay. Because of its proximity to this body of water, the property falls within the Atlantic Coastal Bay Critical Area. *See* Md. Code (1974, 2012 Repl. Vol.), § 8-1807(b) of the Natural Resources Article. Under critical area regulations, the location is designated as an "Intensely Developed Area," which is defined as an area "where residential, commercial, institutional, and/or industrial, developed land uses predominate, and where relatively little natural habitat occurs." *See* COMAR 27.01.02.03; Worcester County Code ("WCC") § NR 3-106(a).

The southern portion of the property includes three and one-half lots along Old

Bridge Road. This portion of the property has been improved with a residence, in-ground swimming pool, pool house, and connecting walkways.

The northern portion of the property consists of two unimproved lots bordering the waterway. Tidal marsh extends from the improved portion of the property to the water's edge. The northern lots are covered entirely by tidal marsh.

### B.  Schwalbach's Variance Request

Schwalbach planned to construct a pier or walkway that would extend across the marsh to connect the improved portion of the property to a proposed dock six feet past the shoreline. Under the County's critical area ordinance, "[n]ew piers or docks shall not extend more than one hundred feet in length over state or private wetlands." WCC § NR 3-125(b)(1). To reach the shoreline, however, Schwalbach's structure would have to extend 180 feet across the marsh. Consequently, on August 14, 2013, he submitted an application for a variance with the Board of Zoning Appeals for Worcester County, requesting "[a] variance [from] the Atlantic Coastal Bays Critical Area Law to authorize a 3 foot wide by 180 foot long pier across tidal marsh."[1]

---

[1] The word "pier" usually refers to a structure that extends from the shore over water. *See, e.g.*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com/dictionary/pier (last visited June 29, 2015). The structure at the subject of Schwalbach's variance request might be more accurately described as an elevated walkway. In any event, the Worcester County critical area ordinance uses the word "pier" as a generic term that includes "[a]ny pier, wharf, dock, walkway, bulkhead, breakwater, piling or other similar structure." WCC § NR 3-102(a). Because the parties, the Board, and the circuit court consistently referred to the structure here as a "pier," we accept and employ that

(continued...)

On September 22, 2013, the Board of Zoning Appeals ("the Board") received a staff report with comments on the variance application. The report included a letter from the Natural Resources Administrator of the Worcester County Department of Developmental Review and Permitting. The letter emphasized: "As the Board is aware from previous variances to the Critical Area Law, all applicants must address six standards. The Critical Area Law requires that each of the six standards for a variance be met before the Board renders a decision."[2]

In Worcester County, the following standards must be satisfied before a critical area variance may be granted:

(b) Standards. The provisions for granting such a variance shall include evidence submitted by the applicant that the following standards are met:

(1) Special conditions or circumstances exist that are peculiar to the applicant's land or structure and a literal enforcement of provisions and requirements of the County's Atlantic Coastal Bays Critical Area Program would result in unwarranted hardship;

(2) A literal interpretation of the provisions of the County's Atlantic Coastal Bays Critical Area Program and related laws will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the Atlantic Coastal Bays Critical Area;

(3) The granting of a variance will not confer upon an applicant any special privilege that would be denied by the County's Atlantic Coastal

_____

[1] (...continued)
designation for the remainder of this opinion.

[2] The report also included a letter from the State Critical Area Commission, which stated that "applicants need to demonstrate and the Board of Appeals needs to find that each and every one of the County's variance standards has been met[.]"

3

Bays Critical Area Program to other lands or structures within the Atlantic Coastal Bays Critical Area;

(4) The variance request is not based upon conditions or circumstances which are the result of actions by the applicant nor does the request arise from any condition relating to land or building use, either permitted or non-conforming on any neighboring property;

(5) The granting of a variance shall not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Atlantic Coastal Bays Critical Area and the granting of the variance will be in harmony with the general spirit and intent of the County's Atlantic Coastal Bays Critical Area Program;

(6) (Reserved)

(7) The Board of Zoning Appeals shall not make a decision relative to a request for such a variance without reviewing the comments of the Department and finding that the applicant has satisfied each of the provisions and standards contained herein.

WCC § NR 3-111(b); *see also* COMAR 27.01.12.04(B).

The staff report commented that, as a result of the layout of the property, Schwalbach would suffer an undue hardship if he were prohibited from constructing a pier in excess of 100 feet in length. The report stated that the property included "[a] large expanse of wetlands," and an owner would be prevented "from reaching navigable waters and enjoy[ing] his riparian rights" without a variance from "regulations that have been implemented long after these lots were platted." The report further stated that any potential adverse environmental impact would be minimal because the structure was modest in size, the project had been subject to extensive environmental review by the U.S. Army Corps of Engineers and the Maryland Department of the Environment, and

4

substantial mitigation would offset any disturbance from the construction.[3]

The staff report concluded that Schwalbach's application satisfied each of the variance standards of the County's zoning ordinance and recommended that the Board approve the request.

### C. Board's Decision Granting Variance

Schwalbach presented his application to the Board at a hearing on October 10, 2013. Schwalbach testified that the purpose of the proposed structure was to provide access to the navigable water at the edge of his property. His documentary submissions included site plans from a professional surveyor who had reviewed the project. The surveyor testified that Schwalbach would not have access to the water if he were forced to shorten the pier to less than the proposed length.

Schwalbach also called a private environmental consultant, who had previously worked as a Natural Resources Administrator for the County. The environmental consultant confirmed that Schwalbach had obtained an authorization from the U.S. Army Corps of Engineers (*see generally* 33 U.S.C. § 403; 33 C.F.R. § 322) and a tidal wetlands license from the Maryland Department of the Environment. The consultant explained that

---

[3] *See* WCC § NR 3-102 (defining "mitigation" as the "[c]reation, restoration or enhancement of forest or other plant communities that were or will be lost due to regulated activities"); WCC § NR 3-111(f)(1) ("[a]dverse impacts resulting from the granting of the variance shall be mitigated by the planting of trees and shrubs on the site at an amount equal to not less than three times the square footage of the area of disturbance allowed by the variance or as recommended by the Department").

he had gone through extensive negotiations with those agencies "to get a configuration that fit the property and fit the water depths and fit the channel specifically for that site." Based on the "stringent special conditions" with which Schwalbach would have to comply during and after construction and while boating, he opined that the proposed pier would have no adverse effect on water quality.[4]

The environmental consultant also testified that the property was located in an area "very heavily used for boating," with "numerous boat docks up and down the shoreline[.]" He estimated that there were several hundred boats at nearby marinas.[5] In sum, he opined that the site plan represented the minimum possible intrusion to allow Schwalbach to enjoy access to the water, a right enjoyed by others in the community.

The Board also received into the record a letter from ACT. Ms. Kathy Phillips, the Assateague Coastkeeper, wrote: "Substantial research data[] and the Worcester County Code support the conclusion that a dock or pier extending 100 feet or more over marsh represents a change in the character of the marsh." She further commented that "while ACT understands and supports the concept of riparian rights, . . . very shallow bodies of

_____

[4] He further testified that he had appeared before the Worcester County Shoreline Commission and received unanimous approval for the construction permit. *See* WCC § NR 2-102. ACT also presented testimony at a hearing before that Commission.

[5] The Schwalbach property and the nearby marinas are located south of the Route 50 drawbridge that connects the mainland to the barrier island on which Ocean City is located. Because of their location south of the drawbridge, these properties allow for easy marine access to the Atlantic Ocean via the Ocean City Inlet, which is also south of the drawbridge.

6

water [are] not capable of supporting regular motorized boat access and should be considered lands protected by the Public Trust." ACT requested that the Board justify its decision in writing if it granted a variance.

At the conclusion of Schwalbach's presentation, the Board members unanimously voted to grant the variance. In a written decision issued on November 14, 2013, the Board adopted and re-stated the findings of fact set forth in the staff report. As its conclusion, the decision stated: "The Board reviewed Staff comments and the Applicant has satisfied all standards."

### D.     ACT's Petition for Judicial Review

On November 22, 2013, ACT filed a petition for judicial review in circuit court.[6] In a memorandum supporting its petition, ACT argued that Schwalbach had failed to prove compliance with each of the individual standards of WCC § NR 3-111(b). At the judicial review hearing, ACT further argued that the Board's decision was "defective on its face" because the decision did not affirmatively express whether Schwalbach had overcome a statutory presumption that the activity subject to the variance application did not conform to the general purpose of the critical area requirements. *See* WCC § NR 3-111(d)(4) (requiring that Board "shall make written findings as to whether the applicant

---

[6] Schwalbach initially moved to dismiss the petition, arguing that ACT lacked standing to challenge the Board's decision. The court denied the motion, citing ACT's participation in the variance hearing and an affidavit from Ms. Phillips regarding standing. Although Schwalbach renewed his objection to ACT's standing at the judicial review hearing, he does not raise any argument about standing in this appeal.

has overcome the presumption of nonconformance").

The circuit court issued an opinion and order on June 20, 2014, affirming the Board's decision. The court found that there was substantial evidence in the record supporting the Board's findings that Schwalbach had satisfied each of the variance standards. The court also concluded that the Board did not erroneously fail to make a separate written finding that Schwalbach had overcome the presumption of nonconformance.

ACT filed a timely notice of appeal from the circuit court's judgment.

**QUESTIONS PRESENTED**

ACT now presents two interconnected questions, which we quote:

I.      Did the [Board] err as a matter of law in finding that [Schwalbach] had proven by competent and substantial evidence each of the six standards required for a variance under [WCC § NR 3-111] without taking into account that [Schwalbach] had the burden to overcome the presumption of nonconformance?

II.     Is the [Board's] decision erroneous as a matter of law because the [Board] never found that [Schwalbach] met his burden of proof and persuasion to overcome the presumption of nonconformance?

As discussed in this opinion, we conclude that substantial evidence in the record supported the Board's determination that the application satisfied each of the variance standards. Even though the Board did not make an express written finding that the applicant had overcome the statutory presumption of nonconformance, that omission, under the circumstances of this case, does not require reversal or remand.

8

## A.    Standards for Granting of Critical Area Variance

In 1984 the General Assembly enacted the Chesapeake and Atlantic Coastal Bays Area Protection Program.  *See* Md. Code (1974, 2012 Repl. Vol.), Subtitle 18 of Title 8 of the Natural Resources Article ("N.R.").  The main purpose of the program is to foster "more sensitive development activity for certain shoreline areas" of the Chesapeake and Atlantic Coastal Bays and their tributaries, "so as to minimize damage to water quality and natural habitats[.]"  N.R. § 8-1801(b).  New development in these shoreline areas is generally presumed to be contrary to the purposes of the critical area program.  N.R. § 8-1801(a)(4).[7]

The critical area law is State-imposed, but locally enforced.  The statute assigns each jurisdiction with primary responsibility for developing a local critical area program, subject to oversight from the State Critical Area Commission.  *See* N.R. § 8-1808(a)(1).  Each local program must meet certain minimum standards, including the establishment of procedures for the granting of variances.  N.R. § 8-1808(c)(1); *see also* COMAR 27.01.12.

"The lodestar for [a local zoning board's] consideration of a variance application"

---

[7] Section 8-1801(a)(4) states that "new development of nonwater-dependent structures . . . is presumed to be contrary to the purpose of this subtitle[.]"  Individual private piers installed or maintained by riparian landowners are not included in this category of "water-dependent" facilities.  *See* COMAR 27.01.03.01(C).

is the unwarranted hardship standard. *Chesapeake Bay Found., Inc. v. DCW Dutchship Island, LLC*, 439 Md. 588, 614 (2014). The statute provides:

> (5) A variance to a local jurisdiction's critical area program may not be granted unless:
>
> (i) Due to special features of a site, or special conditions or circumstances peculiar to the applicant's land or structure, a literal enforcement of the critical area program would result in unwarranted hardship to the applicant;
>
> (ii) The local jurisdiction finds that the applicant has satisfied each one of the variance provisions; and
>
> (iii) Without the variance, the applicant would be deprived of a use of land or a structure permitted to others in accordance with the provisions of the critical area program.

N.R. § 8-1808(d)(5).

In considering a variance application, the local zoning authority "shall presume that the specific development activity in the critical area that is subject to the application and for which a variance is required does not conform with the general purpose and intent" of the Critical Area Program subtitle, its implementing regulations, and the requirements of the local program. N.R. § 8-1808(d)(3)(ii). The applicant bears "the burden of proof and the burden of persuasion to overcome [this] presumption[.]" N.R. § 8-1808(d)(4)(i). "Based on competent and substantial evidence, a local jurisdiction shall make written findings as to whether the applicant has overcome the presumption[.]" N.R.

10

§ 8-1808(d)(4)(ii); *see also* COMAR 27.01.12.04.[8]

The Worcester County ordinance likewise provides that the Board shall presume that the proposed activity does not conform with the general purpose and intent of the critical area laws and regulations; that the applicant bears the burdens of proof and persuasion to overcome the presumption of nonconformance; and that the Board must make written findings as to whether the applicant has overcome the presumption of nonconformance. *See* WCC § NR 3-111(d).

In this appeal, ACT attacks the Board's decision on two fronts. First, ACT contends that Schwalbach's application failed to satisfy some of the individual requirements for a variance. Second, ACT asserts that the Board erred by failing to apply the statutory presumption of nonconformance and by not making a written finding as to whether Schwalbach met his burden to overcome that presumption. Ultimately, neither challenge is successful.

### B.      Substantial Evidence Supporting the Board's Decision

ACT argues that Schwalbach failed to present substantial evidence that his application satisfied "five of the six standards" from the Worcester County critical area ordinance. Because the applicant's failure to meet any one of the standards requires the denial of the variance application (*see* N.R. § 8-1808(d)(5)(ii); COMAR 27.01.12.04(B);

_____

[8] The requirements of section 8-1808(d) apply to all critical area variance applications, notwithstanding any local ordinance or the lack of a local ordinance. *See* N.R. § 8-1808(d)(9).

11

WCC § NR 3-111(b)(7)), we must consider each standard individually.[9]

In considering this challenge, we are cognizant of the limited role that the courts must play in reviewing the decision of a local land-use board. The court's task is to determine whether the issue decided by the agency was at least "fairly debatable" based on all of the evidence. *See Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 138 (2007). As the Court of Appeals has explained:

> Our role in reviewing the final decision of an administrative agency, such as the Board of Appeals, is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. In doing so, a reviewing court decides whether the Board's determination was supported by such evidence as a reasonable mind might accept as adequate to support a conclusion. . . . The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.[] Moreover, a reviewing court must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid.

*Critical Area Comm'n for Chesapeake & Atl. Coastal Bays v. Moreland, LLC*, 418 Md. 111, 122-23 (2011) (citations and quotation marks omitted).

---

[9] In *White v. North*, 356 Md. 31, 50-51 (1999), the Court of Appeals held, under a prior version of the critical area law, that the unwarranted hardship standard was the essential test, and that the other provisions provided guidance but could not be construed individually to overrule a finding of unwarranted hardship. The General Assembly amended the statute in 2002 to add the requirement that an applicant satisfy each of the individual variance provisions. *See Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 131-32 (2007).

### *Unwarranted Hardship*

Before the Board of Zoning Appeals for Worcester County may grant a critical area variance, the applicant must produce evidence to persuade that Board that "[s]pecial conditions or circumstances exist that are peculiar to the applicant's land or structure and a literal enforcement of provisions and requirements of the County's Atlantic Coastal Bays Critical Area Program would result in unwarranted hardship[.]" WCC § NR 3-111(b)(1). In this context, the term "unwarranted hardship" is defined as: "A situation wherein without a variance, an applicant would be denied reasonable and significant use of the entire parcel or lot for which the variance is requested." WCC § NR 3-202; *see also* N.R. § 8-1808(d)(1); COMAR 27.01.12.01.

Schwalbach introduced evidence, in the form of testimony and supporting documents from an environmental consultant and a surveyor, that the features of the property made it impossible to reach the water at the edge of the property without a pier in excess of 100 feet. The Board credited this testimony and concluded that, as a result of the "large expanse of wetlands" located on the property, Schwalbach would not be able to "enjoy his riparian rights" if the zoning restrictions were strictly enforced.

In this appeal, ACT does not dispute the Board's conclusion that Schwalbach could not gain access to the navigable waters bounding his property without a variance.[10]

---

[10] The main premise of ACT's objection to the project was that Schwalbach should not be permitted access to the water, because, ACT argued, the body of water was "not

(continued...)

Instead, ACT contends that the denial of riparian access is not an unwarranted hardship because Schwalbach has already made other extensive improvements on his land.

"'The unwarranted hardship standard, and its similar manifestations, are equivalent to the denial of reasonable and significant use of the property.'" *DCW Dutchship*, 439 Md. at 619 (quoting *Belvoir Farms Homeowners' Ass'n, Inc. v. North*, 355 Md. 259, 282 (1999)). In *Belvoir Farms*, the Court of Appeals explained that the unwarranted hardship standard is generally stricter than a "practical difficulties" standard (*id.* at 266), but not as stringent as an unconstitutional taking standard, which examines whether "a 'regulation denies all economically beneficial or productive use of land.'" *Id.* at 281-82 (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992)). Stated differently, under the unwarranted hardship standard, the need for the variance "'must be substantial and urgent and not merely for the convenience of the applicant[.]'" *Chesley v. City of Annapolis*, 176 Md. App. 413, 432 (2007) (quoting *Belvoir Farms*, 355 Md. at 276). The General Assembly has since modified the definition of unwarranted hardship to clarify that the unwarranted hardship analysis looks to the use of "*the entire parcel or lot* for which the variance is requested." N.R. § 8-1808(d)(1) (emphasis added); *see Becker*, 174 Md. App. at 132-33. Nevertheless, the Court of Appeals has continued to rely on *Belvoir Farms* for the basic proposition that the unwarranted hardship standard is less stringent

———————————

[10] (...continued)
capable of supporting regular motorized boat access."

14

that an unconstitutional takings standard.  *See DCW Dutchship*, 439 Md. at 618-19.

In *DCW Dutchship*, the Court of Appeals upheld a local board's finding that the unwarranted hardship criterion was satisfied, where testimony showed that no dwelling could be built on a particular property without a variance.  *Id.* at 619 & n.25; *accord Becker*, 174 Md. App. at 144 (instructing zoning board on remand to reconsider the variance criteria, while "recognizing that [the property owners] are entitled to build some type of reasonable structure"); *id.* at 141 (noting that "here, a house can be legally built on the property in question, but not without variances, and a potential constitutional taking is a serious concern").

In the instant case, the right asserted is not the right to construct a residence, but the right of access from that residence to the navigable waters bordering the property. Neither this Court nor the Court of Appeals has decided the question of whether denying an owner riparian access may amount to the denial of reasonable and substantial use of the entire property.[11]

As Schwalbach points out, under Maryland common law a "'riparian proprietor, whose land is bounded by a navigable river, . . . has the right of access to the navigable

_____

[11] A number of cases have addressed, either directly or indirectly, whether the denial of other uses may constitute an unwarranted hardship.  *E.g.*, *Lewis v. Dep't of Nat'l Res.*, 377 Md. 382, 412-17 (2003) (hunting camp); *Mastandrea v. North*, 361 Md. 107, 134-37 (2000) (brick-in-sand pathway); *White v. North*, 356 Md. 31, 48-52 (1999) (in-ground swimming pool).  These authorities, however, were decided before the General Assembly added the requirement that the reviewing body examine the use of the entire parcel or lot.

15

part of the river from the front of his lot, and the right to make a landing, wharf, or pier for his own use[.]'" *White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 16-17 (2008) (quoting *Baltimore & Ohio R.R. Co. v. Chase*, 43 Md. 23, 35 (1875)). These common-law riparian rights are valuable property rights "'of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation.'" *Pines*, 403 Md. at 17 (quoting *Chase*, 43 Md. at 35). Under the Maryland Code, an owner of property on state or private wetlands has the right to make certain improvements to exercise riparian rights and to preserve access to navigable water. *See* Md. Code (1982, 2007 Repl. Vol.), §§ 16-201(a), 16-304(3) of the Environment Article ("Envir.").

ACT points out that these riparian rights nonetheless remain "subject to such general rules and regulations as the [l]egislature may think proper to prescribe for the protection of the rights of the public[.]" *Pines*, 403 Md. at 17. But although an owner's riparian rights are not absolute, Schwalbach's effort to exercise an important component of his property rights, in a boating community where riparian access is an important attribute of land ownership, makes his request more urgent and substantial than other requests. He did not make his application for the sake of mere convenience or from the desire to add a pleasant amenity. *Cf. Chesley*, 176 Md. App. at 435-36 (affirming denial of variance where board reasonably concluded that proposed garage was mere convenience for owner) (citing *Citrano v. North*, 123 Md. App. 234, 242 (1998)

16

(affirming determination that denial of critical area variance to construct free-standing deck on which to enjoy view was not a hardship); *North v. St. Mary's Cnty.*, 99 Md. App. 502, 519 (1994) (reversing determination that denial of critical area variance to construct gazebo on which to enjoy view amounted to hardship)).

The Board here concluded that prohibiting access from the residence to the navigable waters bounding the property amounts to the denial of reasonable and substantial use of the entire property. In this context, the Board's interpretation and application of its guiding statute is entitled to considerable weight. *See DCW Dutchship*, 439 Md. at 626. The Court of Appeals has emphasized: "'Whether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts.'" *Id.* at 619 (quoting *Belvoir Farms*, 355 Md. at 282); *see DCW Dutchship*, 439 Md. at 630 ("[w]hen addressing the issue of reasonable and significant use, a substantial amount of deference to the Board's findings is required") (citing *White v. North*, 356 Md. 31, 49-50 (1999) ("whether a property owner is being denied a reasonable and significant use initially will be a determination of the zoning agency, which we presume possesses the necessary expertise to decide what is reasonable and significant")); *see also Chesley*, 176 Md. App. at 436.

In light of the considerable deference that is owed to the Board's factual findings and to its interpretation of the statute it is charged with implementing, we will not disturb

17

the Board's determination as to the unwarranted hardship criterion. It was reasonable for the Board to conclude that the need for the variance arose from special features that were peculiar to the property. Particularly in light of the importance of riparian access in what is essentially a boating community, with several marinas and hundreds of vessels in the immediate vicinity, the question of whether the deprivation of riparian access amounted to the denial of reasonable and substantial use of the entire property was properly addressed to the expertise of the Board.[12]

### *Hardship Not Self-Created*

The Board here found that Schwalbach's application satisfied the statutory requirement that "[t]he variance request is not based upon conditions or circumstances which are the result of actions by the applicant nor does the request arise from any condition relating to land or building use, either permitted or non-conforming on any neighboring property[.]" WCC § NR 3-111(b)(4).

ACT does not directly argue that Schwalbach's hardship was self-created. Within its argument regarding the unwarranted hardship standard, however, ACT suggests that

---

[12] Schwalbach argues, at some length, that without a variance he would be denied *all* use of the two undeveloped lots. He asserts that the undeveloped lots are separately platted and together form a separate tax parcel. Although his assertion appears to be factually correct, Schwalbach did not present this argument to the Board, and it did not form a basis for the decision. The Board granted Schwalbach's request for a variance for the entire property, not for any individual lot or parcel. Moreover, the structure is not limited to the undeveloped lots: it begins on the developed lots. For these reasons, we have analyzed the decision by examining the use of the entire property for which the variance was requested, and not the use of the individual lots or parcels.

18

the hardship cannot be attributed to the land configuration and zoning restrictions, because Schwalbach purchased the property "well after the enactment of the Law and with knowledge – actual or constructive – of the restrictions imposed by the Law." ACT cites a passage from *Cromwell v. Ward*, 102 Md. App. 691, 717 (1995), in which this Court quoted this sentence from *Sibley v. Inhabitants of Town of Wells*, 462 A.2d 27, 31 (Me. 1983): "[W]hen a landowner purchases land with actual or constructive knowledge of the zoning restrictions, he may not be granted a variance on the grounds of undue hardship."

More recently, however, in *Richard Roeser Professional Builder, Inc. v. Anne Arundel Cnty.*, 368 Md. 294 (2002), the Court of Appeals held that a landowner's purchase of property, with knowledge that the property was located in the critical area adjacent to wetlands (*id.* at 296), was not a self-created hardship that precluded the grant of an area variance. *See id.* at 318-19. Consequently, Schwalbach's knowledge that he purchased a property subject to critical area restrictions does not prevent him from receiving a variance here.

### *Deprivation of Rights Commonly Enjoyed / No Special Privilege*

Under the critical area ordinance, a local board may grant a variance only if: "[a] literal interpretation of the provisions of the County's Atlantic Coastal Bays Critical Area Program and related laws will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the Atlantic Coastal Bays Critical Area;" and if "[t]he

19

granting of a variance will not confer upon an applicant any special privilege that would be denied by the County's Atlantic Coastal Bays Critical Area Program to other lands or structures within the Atlantic Coastal Bays Critical Area[.]"  WCC § NR 3-111(b)(2)-(3). Because these two variance standards are interrelated, they can be, and often are, considered together.  *See DCW Dutchship*, 439 Md. at 633.

The Board's decision with respect to these two standards relied upon findings from its staff report, which noted that "there are numerous properties that have piers/walkways that cross in excess of 100' of tidal wetlands to access their water dependent facility." ACT challenges this finding, arguing that there was no evidence showing the number of piers in excess of 100 feet, the lengths of those piers, whether those piers were constructed before the adoption of the critical area law, and whether variances were necessary for the construction of those piers.

In response, Schwalbach asserts that the Board was entitled to rely on a report from a government agency with specialized knowledge of the critical area.  Furthermore, Schwalbach argues that he was not required to show that any others in the community had piers or docks in excess of 100 feet.  The right "commonly enjoyed by other properties" was not the right to build a structure of 101 feet or more in length, but the general right of access to navigable waters at the edge of private property.

The Board here stated that Schwalbach's proposal "was not unreasonable and seems to be very modest by providing the most direct access path to navigable waters.

Without this variance, it could be interpreted that the applicant would have a lessened or reduced amount of rights enjoyed by other properties in similar areas within the Critical Area." This finding was supported by testimony from Schwalbach's expert that numerous private boat docks in the nearby area were used to gain access to the same body of water. In light of this testimony, merely having riparian access is not a special privilege.

We conclude that substantial evidence supported the Board's findings that the variance was necessary for Schwalbach to enjoy the right of riparian access commonly enjoyed by others in the area and that granting the variance would not confer any special privilege denied to other property owners in the area. *See DCW Dutchship*, 439 Md. at 633-34 (holding that substantial evidence supported zoning board's conclusions as to these two standards, where Board "observed that property owners throughout Critical Area commonly enjoy a residence" and evidence showed that property owner could not enjoy same right without variance).

### *Adverse Environmental Effects; Purpose and Intent of Critical Area Program*

Next, ACT contends that Schwalbach's application did not meet the standard set forth in WCC § NR 3-111(b)(5), which requires that a variance request be denied unless "[t]he granting of a variance shall not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Atlantic Coastal Bays Critical Area and the granting of the variance will be in harmony with the general spirit and intent of the

21

County's Atlantic Coastal Bays Critical Area Program[.]" The Court of Appeals has emphasized that determinations as to this particular standard fall within the relative expertise of the administrative agency. *See Belvoir Farms*, 355 Md. at 270-71.

In addressing this standard, the Board's decision gave weight to the approval of the project by both the U.S. Army Corps of Engineers and the Maryland Department of the Environment. The Board stated: "These agencies provide an extensive review of a wide array of environmental impacts and have determined that this proposed wetland crossing has minimized these potential impacts." The critical area law specifically identifies other government agencies as a potential source of substantial evidence. *See* N.R. § 8-1808(d)(4); WCC § NR 3-111(d)(4) ("[w]ith due regard for the person's experience, technical competence, and specialized knowledge, the written findings may be based on evidence introduced and testimony presented by . . . [a]ny agency of the local, state or federal government; or . . . [a]ny other person deemed appropriate by the Board of Zoning Appeals").

ACT argues that these approvals from other agencies are legally insufficient to satisfy the applicant's burden, because those agencies do not apply the same criteria as the critical area program. While we agree that the grant of a license or authorization does not automatically establish that a proposed construction project meets critical area standards, we reject the contention that an approval from another agency cannot amount to evidence that the applicant has met the variance standards.

22

The record before the Board included the authorization letter from the Army Corps of Engineers, which provided a detailed list of "activity-specific impact limits and requirements," including the requirements that Schwalbach "restore all preconstruction elevations and replant impacted wetland area with native marsh species within the limits of the disturbance upon completion of the proposed work." Moreover, the Board was no doubt aware that the policies governing tidal wetlands licenses from the Maryland Department of the Environment are largely in harmony with the spirit and intent of the critical area law. *Compare* Envir. § 16-102 (declaring State policy to preserve wetlands from despoliation and destruction), *and* COMAR 26.24.01.01 (requiring applicants to design projects to avoid, minimize, and mitigate any loss of tidal wetlands), *with* N.R. § 8-1801(a) (declaring that purposes of critical area law include minimizing damage to water quality and natural habitats, protecting lands adjacent to shoreline from degradation, and maintaining a buffer from tidal wetlands).

In any event, these approvals were not the only evidence regarding the absence of environmental impact. Schwalbach's environmental consultant opined that the configuration of the proposed structure eliminated adverse effects on water quality. The staff report highlighted that Schwalbach would be required to mitigate any adverse impact with new plantings, "based on an amount equal to not less than three times the square footage of any area buffer disturbance required for construction." The Board also noted that the minimal size of the proposed structure, at "only 3' in width . . . further reduces the

23

risk of any environmental degradation."

Taking the record as a whole and drawing all reasonable inferences in favor of the agency, we conclude that substantial evidence supported the Board's determinations that granting the variance would have no adverse environmental impact and would be in harmony with the general spirit and intent of the critical area program. *See DCW Dutchship*, 439 Md. at 634-37 (holding that Board's findings as to these two criteria were supported by substantial evidence, including expert testimony about water quality and mitigation); *see also Mastandrea v. North*, 361 Md. 107, 140-42 (2000) (holding that Board's findings as to these two criteria were supported by substantial evidence, including opinion of environmental consultant that proposed construction would have no adverse effect, where Board also noted that size of project was minimal and potential effects were easily mitigated).[13]

### *Satisfaction of Each Variance Provision*

Finally, ACT contends that Schwalbach failed to satisfy WCC § NR 3-111(b)(7),

---

[13] Applying an earlier version of the critical area law, the Court in *Mastandrea*, 361 Md. at 136, concluded that the local zoning board could grant a variance if the applicant would be denied development on a specific portion of the applicant's property, rather than considering the parcel or lot as a whole. The 2002 General Assembly expressly overruled that holding. *See Chesley*, 176 Md. App. at 433-34. Although the legislature has abrogated much of *Mastandrea*'s unwarranted hardship analysis, other aspects of the opinion remain good precedent. *See DCW Dutchship*, 439 Md. at 629 n.33 (explaining, "[w]here applicable, we discuss the *Mastandrea* Court's discussion of variance issues that did not prompt legislative supersession"); *Moreland*, 418 Md. at 134 (applying *Mastandrea*); *Becker*, 174 Md. App. at 144 (directing Board to reconsider decision in light of *Mastandrea*).

24

which states that the Board "shall not make a decision relative to a request for such a variance without reviewing the comments of the Department and finding that the applicant has satisfied each of the provisions and standards contained herein." With respect to this final criterion, ACT re-states its prior assertions that Schwalbach had not satisfied *each* of the other standards. Because we reject each of ACT's challenges as to those individual standards, we must reject the corollary argument that he failed to satisfy "each of the provisions and standards."

## C.     Board's Application of the Presumption of Nonconformance

In addition to its specific challenges regarding the individual variance standards, ACT poses a more general objection to the form and substance of the decision. ACT relies on the Board's obligation to presume that the requested activity did "not conform with the general purpose and intent of Natural Resources Article, Title 8, Subtitle 18, COMAR Title 27, as from time to time amended, and the requirements of the County's Atlantic Coastal Bays Critical Area Program." WCC § 3-111(d)(1); *see* N.R. § 8-1808(d)(3)(ii). Schwalbach bore the burdens of production and persuasion to overcome that presumption. *See* WCC § NR 3-111(d); *see also* N.R. § 8-1808(d)(4)(i). The presumption extends to each of the individual variance standards. *See Becker*, 174 Md. App. at 143 ("it was [applicants'] burden to present evidence and overcome the presumption as to *all* of the requirements") (emphasis in original); *see also DCW Dutchship*, 439 Md. at 614 ("[t]he applicant 'bears the burden of proof and persuasion' as

25

to each of the variance criteria") (quoting *Moreland*, 418 Md. at 119).

ACT asserts: "The [Board's] decision does not indicate that the [Board] was aware of the presumption of nonconformance, that [Schwalbach] had the burden of proof to overcome the presumption of nonconformance, or that [Schwalbach] had met that burden." ACT argues that the decision must be reversed in the absence of some unequivocal indication that the Board applied the statutory presumption. Alternatively, ACT asks this Court to remand with instructions that the Board reconsider the application and make additional written findings in light of the statutory presumption.

In ACT's interpretation, the statutory presumption creates a separate obstacle, over and above the individual variance standards. ACT theorizes: "It is much easier for [Schwalbach] to prove he satisfied each of the six standards than it is for [Schwalbach] to prove he overcame a presumption of nonconformance *and* that he satisfied each of the six standards." In response, Schwalbach contends that the Board's explicit statements that an applicant must satisfy all six standards amount to an "obvious reference" to the burden of overcoming the statutory presumption. Schwalbach also argues that the Board should be deemed to understand its own procedures.

As this Court has explained, an applicant meets the burden of overcoming the presumption that a proposal is in conflict with the critical area ordinance "'by satisfying fully the dictates of the statute authorizing the variance.'" *Citrano*, 123 Md. App. at 238 (quoting *North v. St. Mary's Cnty.*, 99 Md. App. at 510); *see also Becker*, 174 Md. App.

26

at 145-46 ("[i]f an applicant establishes compliance with the applicable criteria, the applicant is entitled to the variance"). After the applicant produces substantial evidence, and the Board is persuaded that the applicant has satisfied all applicable criteria, the Board is no longer required to assume that granting the variance is inimical to the intent of the program.

There is no reason to require that an applicant who has overcome his or her respective burdens as to all of the variance criteria must also come forward with additional evidence to rebut the statutory presumption. That requirement would serve no practical purpose in the context of this particular ordinance. The Board here expressly found that the project would "not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Atlantic Coastal Bays Critical Area and the granting of the variance will be in harmony with the general spirit and intent of the County's Atlantic Coastal Bays Critical Area Program." *See* WCC § NR 3-111(b)(5).[14]

On this issue, we agree with the well-reasoned analysis of the circuit court:

The [Board's] opinion expressly stated that the [Board] had reviewed the

_____

[14] This standard refers only to the general spirit and intent of the *County* program, but the presumption also extends to the general purpose and intent of the *State* critical area law and its implementing regulations. *Compare* WCC § NR 3-111(b)(5), *with* WCC § 3-111(d)(1). The County requirements, of course, are the greater that include the lesser. The local program is designed to implement and to achieve the purpose of the State law and regulations. *See* N.R. § 8-1808(a)(1); COMAR 27.01.12.02; WCC § NR 3-101(a). The State law establishes minimum requirements (*see* N.R. § 8-1808(c)(1)), and the County is permitted to "establish additional, more restrictive standards" consistent with the spirit of the State program. COMAR 27.01.12.02(B).

27

staff comments and found the applicant satisfied all standards. That finding extended to all required standards and provisions – including that part of [WCC § NR 3-111(b)(5)] which required a finding that the granting of the variance be *in harmony with the general spirit and intent of the Critical Area Program*. It seems clear to this court that the words *in harmony with* have the same meaning as the words *conform with*. Thus, the [Board's] finding that the variance is *in harmony with the general purpose and intent of the Critical Area Program* is the same as a finding that the variance *conforms with the general purpose and intent of the program*. It is also the same as a finding that *the applicant has overcome the presumption of nonconformance*.

In the circumstances of this case, it would not be a sound use of public or private resources to remand this case for the sole purpose of requiring the Board to go through the sterile formality of restating what it has already said, but doing so in the language of the ordinance itself instead of the synonymous language that it previously used.

As ACT points out, however, the statute directs that "a local jurisdiction shall make written findings as to whether the applicant has overcome the presumption" of nonconformance. N.R. § 8-1808(d)(4)(ii); *see* COMAR 27.01.12.04; WCC § NR 3-111(d)(4). In light of this directive, it might be a better practice for the Board to state explicitly whether the applicant has overcome the presumption of nonconformance, in addition to making express findings as to whether the applicant has satisfied his burdens as to each of the variance provisions. Under the circumstances here, however, "we do not think anything would be gained by remanding the case for further consideration." *Valenzia v. Zoning Bd. of Howard Cnty.*, 270 Md. 478, 485 (1973).

The Board's determinations that Schwalbach satisfied each of the variance criteria

and that the project was in harmony with the local critical area program (findings that we uphold), obviate the need for any additional analysis from the Board regarding the statutory presumption. Even assuming that the Board erred by not making this separate written finding, that hypothetical error does not require reversal. *See Gough v. Bd. of Zoning Appeals for Calvert Cnty.*, 21 Md. App. 697, 699-704 (1974) (reasoning that county board of zoning appeals should have made more explicit findings in denying variance request, but holding that there was no fundamental error because those findings were implicit in the actual determination); *Templeton v. Cnty. Council of Prince George's Cnty.*, 21 Md. App. 636, 641-42 (1974) (holding that, although zoning body erred by failing to make factual finding on one issue in denying request for zoning reclassification, the error was "not of such as dimension as to require reversal" where it was clear that the issue was not determinative).

CONCLUSION

For the reasons stated in this opinion, we affirm the judgment of the circuit court, which affirmed the decision of the Board of Zoning Appeals to grant the variance application. The record as a whole included substantial evidence to support the Board's findings and conclusions, and the Board's decision was not premised upon any error of law.

> **JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**