*Assateague Coastal Trust, Inc. v. Roy T. Schwalbach, et al.*
No. 59, September Term 2015

**Critical Area Law – Variance – Requirement to Show Unwarranted Hardship.** Under the State Critical Area Program and the corresponding Worcester County ordinance, a property owner seeking a variance from a provision of the Critical Area requirements bears the burden of showing, among other things, that there are special conditions or circumstances peculiar to the property, such that literal enforcement of the Critical Area provision would result in an "unwarranted hardship." In order to establish an unwarranted hardship, an applicant must show that, without the proposed variance, the applicant would be denied a reasonable and significant use – an assessment to be made with respect to the entire property. There was substantial evidence to support a local zoning appeals board's finding that a variance from a local limit on pier length was necessary to avoid an unwarranted hardship when a pier of the proposed length and location was required for the applicant to enjoy riparian rights in a boating community in an area designated as an "intensely developed area" and environmental agencies had approved the pier subject to conditions. Maryland Code, Natural Resources Article, §8-1808(d)(1), (d)(5)(i); COMAR 27.01.12.04B(1); Worcester County Code, Natural Resources Article, §3-111(b)(1).

**Critical Area Law – Variance – Requirement to Show No Adverse Environmental Impact.** Under the State Critical Area Program and the corresponding Worcester County ordinance, an applicant for a variance from a provision of the Critical Area law bears the burden of showing, among other things, that granting the variance will not adversely affect water quality or the fish, wildlife, or plant habitat within the Critical Area. A local zoning appeals board that determines that an applicant has borne the burden of proof on all requirements for a variance, including the requirement that there be no adverse environmental impact, will be upheld as to that determination if there is substantial evidence in the administrative record to support such a finding. Maryland Code, Natural Resources Article, §8-1808(c)(iii)(13); COMAR 27.01.12.04B(6); Worcester County Code, Natural Resources Article, §3-111(b)(5).

**Critical Area Law – Variance – Presumption of Non-Conformity with Purpose and Intent of Law.** Under the State Critical Area Program, an applicant for a variance from a provision of that law bears the burden of proof and burden of persuasion on all requirements for a variance. The local jurisdiction is to presume that that an application for a variance does not conform with the general purpose and intent of the law and must make written findings as to whether the applicant has overcome that presumption. Written findings by a local zoning appeals board that an applicant has carried the applicant's burden of proof as to all standards governing a variance suffice as a written finding that the applicant has rebutted the presumption. Maryland Code, Natural Resources Article, §8-1808(d)(3)-(4); Worcester County Code, Natural Resources Article, §3-111(d)(1).

Circuit Court for Worcester County
Case No. 23-C-13-1617

Argued: February 9, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 59
September Term, 2015

_____

ASSATEAGUE COASTAL TRUST, INC.

v.

ROY T. SCHWALBACH, *et al.*

_____

Barbera, CJ
*Battaglia
Greene
**Adkins
McDonald
Watts
Rodowsky, Lawrence F.
(Retired, Specially
Assigned),
JJ.

_____

Opinion by McDonald, J.
Battaglia, J. joins in the judgment only.

_____

Filed: May 23, 2016

*Battaglia, J., now retired, participated in the hearing
and conference of this case while an active member of
this Court; after being recalled pursuant to the
Constitution, Article IV, Section 3A, she also
participated in the decision and adoption of this
opinion.

**Adkins, J., participated in the hearing and
conference of this case, but recused herself prior to the
adoption of this opinion.

In the State's Critical Area law, the General Assembly has established a cooperative program with local jurisdictions to ensure that land near Chesapeake Bay and the Atlantic coastal bays has special protection against development that might cause environmental damage. Although that law allows a property owner to seek a variance from the law's restrictions, the law creates a presumption that a proposed variance does not conform to the purpose and intent of the Critical Area law and places the burden of proof on the applicant to demonstrate that all of the criteria for a variance have been met. Among other things, the applicant must show that the applicant would suffer an "unwarranted hardship" without the variance and that granting the variance will not have an adverse environmental impact.

In this case, Respondent Roy T. Schwalbach sought a variance from a provision in a Worcester County ordinance that limits piers to 100 feet in length. He needed the variance in order to build an extended pier to access navigable water from his waterfront property in a community where piers and boating are common. Mr. Schwalbach obtained necessary approvals from federal, State, and local environmental agencies. The Worcester County Board of Zoning Appeals ("Board") granted the variance after holding an evidentiary hearing and finding that Mr. Schwalbach had borne the burden of proof on all of the requirements for a variance.

Petitioner Assateague Coastal Trust, Inc. ("ACT"), an environmental advocacy organization, sought judicial review of the grant of the variance, arguing that the Board's

decision was defective for several reasons. The Circuit Court for Worcester County and the Court of Special Appeals both upheld the Board's decision in written opinions that analyzed the evidence before the Board on the criteria for a variance.

Before us, ACT focuses its contentions on three arguments. ACT argues: (1) that denial of the variance would not deny Mr. Schwalbach all reasonable and significant use of the entire property and therefore he could not establish an "unwarranted hardship"; (2) that Mr. Schwalbach did not show, and the Board did not explicitly find, that there would be no adverse environmental impact from granting the variance; and (3) that, although the Board's written decision concluded that Mr. Schwalbach had satisfied all standards for the variance, the Board did not make an explicit written finding that he had rebutted the statutory presumption of non-conformity with the Critical Area law.

We agree with the Circuit Court and Court of Special Appeals that the Board's decision should be upheld. In our view, in order to establish an "unwarranted hardship," Mr. Schwalbach was not required to show that he would be denied *all* reasonable and significant use of his land without the variance – in essence, a showing of an unconstitutional taking – but rather that he would be denied *a* reasonable and significant use throughout the entire property. There was sufficient evidence for the Board to conclude that Mr. Schwalbach had satisfied that standard as well as the standard that there be no adverse environmental impact from granting the variance. In addition, the Board's statement that the application had "satisfied all standards" adequately expressed its determination concerning the environmental impact standard and its conclusion that the evidence presented to it had overcome the statutory presumption of non-conformity.

2

# I

# Background

## A.     *Statutory framework*

*The Critical Area Program*

In order to protect the Chesapeake and Atlantic coastal bays, the General Assembly has enacted the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program ("Critical Area Program").  *See* NR §8-1801 (describing legislative findings and purpose of the Critical Area Program).  The Critical Area Program is a cooperative program between the State and local governments that places restrictions on development in certain environmentally sensitive areas.  *See id.*; NR §8-1807.   The Critical Area Program is designed to:

- Minimize adverse impacts on water quality as a result of pollutants discharged from structures or conveyances or run-offs from land

- Conserve fish, wildlife, and plant habitat

- Establish land use policies that accommodate growth while addressing adverse environmental impacts

NR §8-1808(b).  Generally speaking, the Critical Area consists of a 1000-foot swath of land adjacent to the Chesapeake Bay, the Atlantic coastal bays, and their tributaries.  NR §8-1807.  Local Critical Area programs are to accord special protection to "buffer" areas along the shoreline.  *See, e.g.,* NR §§8-1801(a)(2), 8-1801(a)(4), 8-1806(b), 8-1808(c)(1)(iii).

3

Under the Critical Area Program, land within the Critical Area is divided into three categories – Intensely Developed Areas, Limited Development Areas, and Resource Conservation Areas. NR §8-1802(a)(13), (15), (22). An Intensely Developed Area is defined as a part of the Critical Area where residential, commercial, institutional, or industrial developed land uses predominate, and where there is relatively little natural habitat. *See* COMAR 27.01.02.03. Intense development is to be directed to Intensely Developed Areas. COMAR 27.01.02.02; *see also* Mueller, *Paved Intentions: Maryland's Critical Area Act*, 41 Md. Bar J. 10, 12 (2008).

*Restriction on Pier Length in Worcester County*

Because the program is cooperative, State law creates some restrictions, and local law creates others. In Worcester County, the additional restrictions are codified in the Atlantic Coastal Bays Critical Area subtitle of the Natural Resources Article of the Worcester County Code ("WCC NR"). One restriction unique to Worcester County is that new piers or docks over State or private wetlands are limited to 100 feet in length. WCC NR §3-125(b)(1).

*Variances*

A person seeking to develop property in a manner that would violate the Critical Area Program in Worcester County may ask for a variance. WCC NR §3-111. Pertinent to this case, the request for a variance must meet six requirements:

> (1) Special conditions or circumstances exist that are peculiar to the applicant's land or structure and a literal enforcement of provisions and requirements of the County's Atlantic Coastal Bays Critical Area Program would result in *unwarranted hardship*;

4

(2) A literal interpretation of the provisions of the Atlantic Coastal Bays Critical Area Program and related laws will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the Atlantic Coastal Bays Critical Area;

(3) The granting of a variance will not confer upon an applicant any special privilege that would be denied by the County's Atlantic Coastal Bays Critical Area Program to other lands or structures within the Atlantic Coastal Bays Critical Area;

(4) The variance request is not based upon conditions or circumstances which are the result of actions by the applicant, nor does the request arise from any condition relating to land or building use, either permitted or non-conforming on any neighboring property;

(5) The granting of a variance shall not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Atlantic Coastal Bays Critical Area and the granting of the variance will be in harmony with the general spirit and intent of the County's Atlantic Coastal Bays Critical Area Program;

[6[1]]The Board of Zoning Appeals shall not make a decision relative to a request for such a variance without reviewing the comments of the [County] Department [designated to enforce the Critical Area Program] and finding that the applicant has satisfied each of the provisions and standards contained herein.

WCC NR §3-111(b) (emphasis added); *see also* COMAR 27.01.12.04B (listing substantially the same requirements, although missing the last and divided differently); NR §8-1808(d)(5)(i) (also requiring a showing of "unwarranted hardship" as a prerequisite to a variance from a local Critical Area program).

---

[1] One of the original requirements in the ordinance was repealed, so "(6)" in the ordinance is now marked as "reserved" and the sixth requirement is listed as "(7)."

5

Thus, among other things, an applicant for a variance must prove that the applicant would otherwise suffer an unwarranted hardship (standard 1) and that there will not be an adverse effect on water quality or animal and plant habitat from granting the variance (standard 5). The Critical Area law defines "unwarranted hardship" to mean that "without a variance, an applicant would be denied reasonable and significant use of the entire parcel or lot for which the variance is requested." NR §8-1808(d)(1); COMAR 27.01.12.01; *see also* WCC NR §3-102 (identical definition for purposes of the County law).

In general, "[i]n considering an application for a variance, a local jurisdiction shall presume that the specific development activity in the critical area that is subject to the application and for which a variance is required does not conform with the general purpose and intent of" the Critical Area Program. NR §8-1808(d)(3)(ii); *see also* WCC NR §3-111(d)(1). "An applicant has the burden of proof and the burden of persuasion to overcome" this presumption. NR §8-1808(d)(4)(i); *see also* WCC NR §3-111(d)(3). "Based on competent and substantial evidence, a local jurisdiction shall make written findings as to whether the applicant has overcome" this presumption. NR §8-1808(d)(4)(ii)(1); *see also* WCC NR §3-111(d)(4).

## B. *Facts and Procedural History*

### *The Schwalbach Property*

The pertinent facts are uncontested. Mr. Schwalbach's property adjoins a tributary of Sinepuxent Bay in an area known as West Ocean City in Worcester County. The property is comprised of five and one-half lots that were platted in 1924. A single-family home stands on one of the lots; two of the lots are entirely within a tidal marsh. The

6

surrounding area is an active boating community and includes a large commercial fishing marina. Many of the nearby single-family residences have piers that extend into the marsh in order to access navigable water. The property is located within the Atlantic Coastal Bay Critical Area, has a critical area designation as an Intensely Developed Area, and is zoned R-3 (Multifamily Residential District) in the County zoning ordinance.

*The Proposed Pier and Variance*

Mr. Schwalbach seeks to build a pier – perhaps better described as a walkway – across the marsh to allow access to navigable water. The pier would measure 3 feet in width by 180 feet in length and would extend to a proposed dock at the shoreline. Mr. Schwalbach has obtained all necessary permits, including a tidal wetlands license from the Maryland Department of the Environment, an authorization from the United States Army Corps of Engineers, and the approval of the Worcester County Shoreline Commission (the last of which came after an advertised public hearing). Those agencies placed various conditions on the construction and use of the pier and required certain plantings and other mitigation to protect the marshland.

On August 14, 2013, Mr. Schwalbach applied to the Worcester County Board of Zoning Appeals for a variance from the provision in the Worcester County ordinance that limits the length of piers across tidal wetlands to 100 feet. *See* WCC NR §3-125(b)(1). In a report dated September 23, 2013, Board staff evaluated each of the six standards set forth in the Worcester County Code and recommended approval of the variance. Among other things, the staff concluded that Mr. Schwalbach would be unable to reach the navigable waters adjacent to his property without the variance, that the environmental impact would

7

be minimal and would be mitigated by the plantings required by the agencies that had issued permits for the pier, and that failure to grant a variance would result in an unwarranted hardship for Mr. Schwalbach. The Critical Area Commission did not oppose the application, but submitted a letter in which it noted that the property was designated an Intensely Developed Area and that Mr. Schwalbach had received approvals from other agencies, reminded the Board that it must find that an applicant satisfies all standards in the County ordinance, and asked the Board to notify it of the outcome.

*Hearing and Decision of the Board of Zoning Appeals*

On October 10, 2013, the Board held a hearing, at which Mr. Schwalbach presented documents and expert testimony, as well as his own testimony. A surveyor testified that Mr. Schwalbach would be unable to reach navigable waters from his property with a shorter pier. An environmental consultant testified that there were numerous docks in the vicinity and that the design of the proposed pier, which had been negotiated with the environmental agencies, would effect the minimal possible intrusion while allowing Mr. Schwalbach to access navigable water. He also stated that, in light of the special conditions imposed by the permitting agencies, the proposed pier would have no adverse effect on water quality. The consultant also noted that the property was located in a "very heavily used area for boating" and that there were several hundred boats in nearby marinas. Mr. Schwalbach testified that his property extended to the water's edge and that he wished to install the pier to have access to navigable water.

ACT wrote a letter in opposition to the variance but did not appear at the hearing. In the letter, the Executive Director of ACT argued that construction of the pier would

result in a change in the character of the marsh.[2]  Although the letter did not specify the variance standards to which ACT's opposition related, the letter appeared to address primarily the fifth standard (adverse environmental impact).  No one else opposed the variance.

At the conclusion of the hearing, the Board voted unanimously to grant the variance. The Board later issued a written decision dated November 14, 2013.  In that decision, the Board adopted the staff report and reiterated the staff's analysis of the six requirements in the ordinance.

*Judicial Review*

ACT disagreed with the Board's decision, and filed a petition for judicial review in the Circuit Court for Worcester County.[3]  ACT argued that the Board's decision was deficient because it failed to make a specific finding that Mr. Schwalbach had overcome the presumption of non-conformity and because Mr. Schwalbach had allegedly failed to establish five of the six factors.[4]  After holding a hearing for legal argument, the Circuit

---

[2] In the letter, the Executive Director of ACT noted that ACT had appeared at a hearing of the Worcester County Shoreline Commission the previous month and had opposed the variance on the ground that the marsh, wetlands, and wet mud flats that comprise the area were better suited to non-motorized boat usage and reported that the Shoreline Commission had approved the application with restrictions on the types of boats that could access the proposed pier.

[3] Mr. Schwalbach moved to dismiss the petition on the ground that ACT lacked standing to seek judicial review of the Board's decision.  The Circuit Court denied that motion and Mr. Schwalbach has not pursued that argument in the appellate courts.

[4]ACT argued that standards 1 (literal enforcement would result in unwarranted hardship), 2 (deprivation of rights commonly enjoyed by other properties), 3 (not a special privilege denied to other lands in the area) and 5 (no adverse effect on water quality or

9

Court issued a detailed written opinion on June 19, 2014, in which it affirmed the decision of the Board and rejected all of ACT's arguments.

ACT appealed to the Court of Special Appeals, making the same arguments as it made before the Circuit Court. The Court of Special Appeals affirmed the Circuit Court decision.[5] 223 Md. App. 631, 117 A.3d 606 (2015). ACT filed a petition for a writ of *certiorari,* which we granted. 445 Md. 19, 123 A.3d 1005 (2015).

## II

## Discussion

### A.     *Standard of Review*

"When we review the final decision of an administrative agency, such as the Board of Appeals, we look through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate the decision of the agency." *People's Counsel for Baltimore County v. Loyola College*, 406 Md. 54, 66, 956 A.2d 166 (2008) (internal quotation marks and brackets omitted). We affirm an agency's decision if there is substantial evidence in the record as a whole to support the agency's

---

wildlife; consistency with general spirit of Critical Area law) were not met. As a result of the failure to meet those standards, ACT argued, Mr. Schwalbach could not establish the sixth standard – *i.e.*, that all of the other standards had been met. In the Circuit Court, ACT did not contend that Mr. Schwalbach had failed to establish standard 4 (hardship not self-created).

[5] Although ACT did not explicitly argue that Mr. Schwalbach failed to satisfy standard 4 (hardship not self-created), the Court of Special Appeals construed ACT's argument concerning standard 1 (unwarranted hardship) as an implicit assertion that Mr. Schwalbach also failed to satisfy standard 4. However, the intermediate appellate court found such an argument to be without merit. 223 Md. App. at 649-50.

findings and conclusions. *Chesapeake Bay Foundation, Inc. v. DCW Dutchship, LLC*, 439 Md. 588, 611, 97 A.3d 135 (2014). An agency's decision is to be reviewed in the light most favorable to it and is presumed to be valid. *Id.* (quotation marks and citation omitted). However, we do not defer to the agency on the applicable legal standards.

Before us, ACT has focused its argument concerning compliance with the requirements for a variance on two standards: standard 1 (unwarranted hardship) and standard 5 (adverse environmental impact). With respect to each of those standards, ACT not only challenges the sufficiency of the evidence before the Board, but also other aspects of its decision. As to standard 1, ACT suggests that the Board applied the wrong legal standard. As to standard 5, ACT contends that the Board failed to make the requisite finding. ACT also continues to contend that Mr. Schwalbach failed to overcome the presumption of non-conformity and that the Board failed to make an express finding to that effect. Thus, we must decide three issues:

1 – Whether there was substantial evidence to support the Board's finding that denial of the variance would result in an "unwarranted hardship" in light of the definition of that phrase.

2 – Whether there was substantial evidence to support a finding that the granting of the variance would not have an adverse environmental impact and whether the Board's decision was sufficiently explicit in making such a finding.

3 – Whether the Board's decision adequately stated that the applicant had overcome the presumption of non-conformity.

11

### B.     *Unwarranted Hardship*

To satisfy the first requirement for a variance under the Critical Area law, an applicant must prove that "[s]pecial conditions or circumstances exist that are peculiar to the applicant's land or structure and that a literal enforcement of provisions and requirements of the County's Atlantic Coastal Bays Critical Area Program would result in unwarranted hardship." WCC NR §3-111(b)(1); *see also* NR §8-1808(d)(5)(i).

The Board found that Mr. Schwalbach had satisfied this standard of the Critical Area law because, without the variance, he would be prohibited from enjoying the riparian rights associated with his property as an expanse of wetlands prevented the property owner from reaching navigable waters.

There appears to be no question that there are special conditions or circumstances present with respect to Mr. Schwalbach's property. An owner of property that is adjacent to a body of water has riparian rights under both common law and statute. *Worton Creek Marina, LLC v. Clagett*, 381 Md. 499, 508-12, 850 A.2d 1169 (2004). Fundamental among those rights is access to the water. *Id*. Thus, it is well established that the property owner has "the right to make a landing, wharf or pier" to provide access to navigable water subject to "general rules and regulations … necessary to protect the rights of the public." *Causey v. Gray*, 250 Md. 380, 387, 243 A.2d 575 (1968). As the Court of Special Appeals pointed out in its opinion in this case, this is a particularly important property right in a boating community. 223 Md. App. at 647. Unsurprisingly, the record before the Board indicates that there are numerous properties in the area of Mr. Schwalbach's property with piers that extend more than 100 feet across the tidal marsh to reach navigable water. Without a

variance allowing an extended pier, Mr. Schwalbach could not have a pier that would reach the navigable water adjoining his property.

The question is whether that inability to exercise that riparian right amounts to an "unwarranted hardship." The statute and local ordinance both define "unwarranted hardship" to mean that, in the absence of a variance, the applicant "would be denied reasonable and significant use of the entire parcel or lot…" NR §8-1808(d)(1); WCC NR §3-102.

ACT appears to concede that denying Mr. Schwalbach a variance would result in at least a "diminution" of his riparian rights. ACT contends that the Board applied the wrong legal standard because "a use," in plain English, is not the same as "use."[6] In the Circuit Court, ACT argued that, in order to demonstrate "unwarranted hardship," Mr. Schwalbach was required "to prove that without the variance he could not make *any* reasonable and significant use of his property." (emphasis added). ACT asserts that he cannot satisfy such a standard because there is already a residence and other improvements on the property. It also argues that Mr. Schwalbach did not prove that, without the variance, he is denied exercise of his riparian rights with non-motorized vessels.

Mr. Schwalbach, of course, agrees with the Board's finding and argues that an inability to exercise his riparian rights to access the navigable water, including with motorized vessels, would deny a reasonable and significant use of the entire property.

---

[6] ACT did not make this argument before the Board, but first raised it in its memorandum to the Circuit Court.

13

We are thus confronted with a problem of statutory construction. To prove an "unwarranted hardship," must an applicant demonstrate a denial of *all* reasonable and significant use of the entire property, or must the applicant show a denial of *a* reasonable and significant use of the entire property?

### 1.    Statutory text

We begin, as always, with the text of the statute. As noted above, the pertinent State statute and County ordinance both define "unwarranted hardship" as a denial of "reasonable and significant use of the entire" property.[7] While it is clear that the restriction must relate in some way to use of the "entire" property and that the deprivation must relate to something that is "reasonable and significant," neither law specifies whether the deprivation must be of all such uses of the entire property – *i.e.*, "any" reasonable and significant use – or it can be of one such use assessed in relation to the entire property – *i.e.*, "a" reasonable and significant use.

A reading of the statute that would require the applicant to demonstrate that, without a variance, the applicant would be foreclosed from *any* reasonable and significant use of the entire property under the Critical Area requirements would appear to require the applicant to meet the standards for a "taking" of the property. Under the "taking" standard, "a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause." *Palazzolo v. Rhode Island*, 533 U.S.

---

[7] Although Mr. Schwalbach's property is platted as five lots, we will treat it as a single parcel, as did the Board and the reviewing courts. *See* 223 Md. App. at 648-49 n.12.

606, 617 (2001) (internal quotation marks omitted); *see also Litz v. Maryland Department of Environment*, 446 Md. 254, 267, 131 A.3d 923 (2016).[8] "All economically beneficial or productive use" of a property would appear to be a subset of "all reasonable and significant use of the entire property." Thus, if Mr. Schwalbach needed to show that he would be denied *all* reasonable and significant use of the property without a variance, then the "unwarranted hardship" standard would collapse into the "taking" standard, because such a showing would also satisfy the "taking" standard. Yet this Court has repeatedly (and recently) held that the "unwarranted hardship" standard is not as demanding as the "taking" standard. *See DCW Dutchship*, 439 Md. at 619.

Accordingly, we are reluctant to accept ACT's assertion the Board applied an incorrect legal standard when it did not require Mr. Schwalbach to show that he would otherwise be prohibited from all reasonable and significant use of the entire property. The legislative history of the Critical Area law confirms we should not.

2. Legislative history

The phrase "unwarranted hardship" first appeared without definition in the regulations of the Critical Area Commission, was later construed by this Court in a series of cases that turned on those regulations, and was ultimately defined by the General Assembly in the Critical Area statute in reaction to that case law.

---

[8] A lesser deprivation may still be a taking. *See Palazzolo*, 533 U.S. at 617.

15

1986:  *Adopting the "unwarranted hardship" standard in regulation*

The phrase "unwarranted hardship" did not appear in the Critical Area law, as it was originally enacted.  *See* Chapter 794, Laws of Maryland 1984.  Rather, the phrase appeared in regulations adopted by the Critical Area Commission and in local Critical Area ordinances required to be consistent with those regulations.  *See* 12:24 Md. Reg. 2352 (November 22, 1985), *adopting* COMAR 14.15.11.[9]  The regulations did not define "unwarranted hardship."

*1999 – 2000:  Defining "unwarranted hardship" in case law*

It fell to this Court to define "unwarranted hardship" in a trio of cases decided during 1999 – 2000.  *Belvoir Farms Homeowners Ass'n, Inc. v. North,* 355 Md. 259, 734 A.2d 227 (1999); *White v. North*, 356 Md. 31, 736 A.2d 1072 (1999); *Mastandrea v. North*, 361 Md. 107, 760 A.2d 677 (2000).

In *Belvoir Farms*, a county board of appeals granted a variance, applying a definition of "unwarranted hardship" that equated that standard with the "practical difficulties" standard under the local zoning law.  This Court held that the "unwarranted hardship" standard is more stringent than the "practical difficulties" standard and that, therefore, the board had committed an error of law.  355 Md. at 265-67.  To provide guidance to the board on remand, the Court articulated a definition of "unwarranted hardship."  It found the phrase to be indistinguishable from the standard of "unnecessary (or undue) hardship" applied in use variance applications:  "whether the applicable zoning

---

[9] COMAR 14.15.11 was recodified as COMAR 27.01.11 in August 1992.

restriction when applied to the property in the setting of its environment is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private ownership." *Id.* at 276 (quotation marks and citation omitted). After further surveying case law in Maryland and other states, the Court concluded that the "unwarranted hardship" standard could be "either the denial of beneficial or reasonable use or the denial of *all* viable economic use, the unconstitutional taking standard." *Id.* at 281 (emphasis added). In the end, it rejected the latter definition, equivalent to the taking standard, as "superfluous" and defined the standard as "denial of reasonable and significant use of the property." *Id.* at 282.

In *White*, a county board of appeals granted a variance from the Critical Area restrictions to permit a homeowner to locate an in-ground pool in a part of the property that lay in the extended buffer established by the Critical Area regulations. The circuit court overturned the grant of the variance, and the Court of Special Appeals affirmed that decision – decisions that were made before this Court had defined "unwarranted hardship" in *Belvoir Farms*. This Court vacated the lower court decisions in *White* and ordered that the case be remanded to the board of appeals for application of the unwarranted hardship standard in light of the definition provided in *Belvoir Farms*. The Court reiterated that an unwarranted hardship "can result from the denial of *a* reasonable and significant use" and that the standard was less stringent than that required to prove a taking. 356 Md. at 49 (emphasis added). The Court then proceeded to discuss the various other standards set forth in the ordinance for a variance. In the course of providing further guidance to the board of appeals on remand, the Court stated that the applicants did not have to satisfy

17

every specific standard of the variance ordinance; rather, the applicants needed only to show whether the requirements were "generally met." *Id*. at 50. The Court also indicated, among other things, that the board could consider the existence of neighbors' pools that pre-dated that Critical Area regulations and that were legal non-conforming uses. *Id*. at 51-52.

In *Mastandrea*, a county board of appeals granted a variance to a homeowner for the construction of brick pathway, part of which lay within the Critical Area buffer, for the benefit of a wheelchair-bound member of the household. The circuit court overturned that decision. This Court issued a writ of *certiorari* in advance of a decision by the Court of Special Appeals and took the occasion to further discuss the concept of "unwarranted hardship."[10] Referring to the definition developed in *Belvoir Farms,* the Court reiterated that an "unwarranted hardship" was "a denial of reasonable and significant use of land" and that it was a lesser standard than required to prove an unconstitutional taking. 361 Md. at 136 (emphasis added). The Court held that the property owners needed to establish whether they "would be denied *a* reasonable and significant use" of the property. *Id.* (emphasis added). The Court also stated that the board did not have to assess whether the use in question related to the "entire" property. Rather, the board should consider whether

---

[10] The Court had issued a writ of *certiorari* in the case originally to consider the relationship of the federal Americans with Disabilities Act to the ordinance governing variances. However, an intervening amendment of the ordinance rendered that issue largely moot.

18

the property owners, in light of the family member's disability, would be denied a reasonable and significant use of the waterfront portion of the property. *Id.*

*2002: Adding the "unwarranted hardship" criterion to the statute*

The General Assembly was apparently displeased with the Court's interpretation of the Critical Areas law in those cases in several respects, although it expressed no discomfort with the Court's articulation of the "unwarranted hardship" standard as less than a taking. In particular, the General Assembly disagreed with the Court's holding in *Mastandrea* that a board could assess the proposed development with respect to only a portion of a property rather than the entire property (including alternative locations for the development), and the holdings in *White* that an applicant need only "generally" satisfy variance requirements and that a board should consider comparable legal non-conforming uses that predated the Critical Area regulations.

In 2002, the Legislature amended the Critical Area statute for the explicit purpose of overruling those decisions with respect to those three holdings. *See* Chapters 431, 432, Laws of Maryland 2002.[11] The preambles of those laws, which described the holdings and the General Assembly's intention to overrule them, provided in pertinent part:

> WHEREAS, Recent decisions by the Maryland Court of Appeals have held that a variance may be granted if the regulations would deny development on a specific portion of an applicant's property rather than considering alternative locations on-site; and

---

[11] The two laws derived from identical bills initiated in the Senate and House of Delegates. *See* Senate Bill 326 (2002); House Bill 528 (2002).

WHEREAS, The Court of Appeals has ruled that a local Board of Appeals, when determining if denial of a variance would deny an applicant rights commonly enjoyed by others in the Critical Area, may compare a proposal to nonconforming uses or development that predated implementation of a local Critical Area Program; and

WHEREAS, The Court of Appeals has ruled that an applicant for a variance from Critical Area requirements may generally satisfy the variance standards of a local zoning ordinance, rather than satisfy all of the standards; and

WHEREAS, These recent rulings by the Court of Appeals are contrary to the intent of the General Assembly in enacting the Chesapeake Bay Critical Area Protection Act; and

WHEREAS, It is the intent of this Act to overrule these recent decisions of the Court of Appeals regarding variances to Critical Area regulations; ….

Preamble to Chapters 431, 432, Laws of Maryland 2002.

The Floor Report for Senate Bill 326 also cited the trio of cases from 1999-2000 and stated:

The purpose of this bill is to establish by statutory authority that:

- The entire property is to be considered when determining whether unwarranted hardship exists;

- Comparisons are applicable only to development since the implementation of a local critical areas program; and

- An applicant is to satisfy all the standards for granting of a variance.

Floor Report for Senate Bill 326 (2002). Among other things, the 2002 legislation required local jurisdictions to find that an applicant for a proposed variance satisfied "each one" of the variance requirements in order to grant a variance, required local jurisdictions to

20

consider the reasonable use of "the entire parcel" in considering a variance application, and required local jurisdictions to incorporate in local law the requirements of the Commission's regulations with respect to variances. *Id., enacting* NR §8-1808(c)(13) & (d) (2002). While the legislation also incorporated the "unwarranted hardship" standard into the Critical Area statute itself, the Legislature did not further define "unwarranted hardship," apparently otherwise satisfied with the definition developed in the case law.[12] *See DCW Dutchship*, 439 Md. at 629 n.33 (noting that aspects of the *Mastandrea* decision concerning variances remained good law after the 2002 legislation).

The Legislature explicitly provided that the 2002 amendments were to be applied "only prospectively" and would not apply to any case in which a petition for judicial review of a grant or denial of a variance application was filed before June 2002. *See* Chapters 431, 432, §§2-3, Laws of Maryland 2002. However, further amendment of the statute was spurred shortly thereafter by another decision of this Court that analyzed the criteria for a variance based on the pre-2002 case law.

*2003: The Lewis Case*

In *Lewis v. Department of Natural Resources*, 377 Md. 382, 833 A.2d 563 (2003), a landowner applied for a variance for a tract of land that was mostly marsh, but which included a 5.3-acre island upon which the applicant occasionally went hunting. The applicant wished to build a seasonal hunting camp on the island. However, due to the

---

[12] A definition identical to the one that now appears in the statute was included in the bills as originally filed, but was struck from the bills before they were enacted. *See* first reader versions of Senate Bill 326 (2002), House Bill 528 (2002).

island's irregular shape, most of the island was in the 100-foot buffer in which development was prohibited under county code provisions adopted pursuant to the Critical Area Program. The applicant sought a variance to build in the buffer.[13]

The local board of zoning appeals denied the variance in part because the applicant could build much of the hunting camp on the part of the island that was not in the buffer. Thus, the property owner would be able to use the property as he wished for a hunting camp even without a variance and therefore was not denied that reasonable and significant use of the property.

This Court vacated and remanded, holding (among other things) that the local board had applied the concept of "unwarranted hardship" too strictly. Because the petition for judicial review in the case had pre-dated the effective date of the 2002 legislation, the Court did not apply the recent amendments that had superseded some of the holdings in the earlier trio of cases, but rather relied on the analysis it had developed in those cases. 377 Md. at 412-17 & n. 16.

More specifically, the Court held that the board should *not* have considered the fact that the applicant could have built much of what he wanted to build even without a variance if he simply located his development elsewhere on the property. As it had in *Mastandrea*, the Court reasoned that the board should not have asked whether the applicant would, without the variance, be denied "a reasonable and significant use of the 'entire' lot" but

---

[13] The applicant actually began building in the buffer before seeking the variance, which was concededly unlawful. However, this aspect of the case is not directly relevant here.

rather whether the applicant would, without the variance, be "denied a reasonable and significant use of [property within the buffer.]" *Lewis*, 377 Md. at 420. The Court also reiterated its holding in *White* that a board must "generally" consider the various criteria for a variance and could not rest denial of a variance on a finding that the applicant failed to establish only one of the criteria. *Id*. at 433-34.

Judge Wilner, joined by two other members of the Court, dissented. He pointed out that the Court appeared to hold that "the focus in every case must be limited to the buffer area," but "that cannot be right" and that the board should consider the property as a whole. *Id.* at 454 (Wilner, J., dissenting). The dissent also argued that the majority opinion had shifted the burden of proof away from the applicant and that the local board should be free to deny the variance if the applicant failed to establish just one of the criteria – for example, if the applicant failed to show that the need for the variance was not self-created.

*2004: Adding the definition of "unwarranted hardship" to the statute*

In response to the *Lewis* decision, the General Assembly revisited the Critical Area law and, among other things, enacted the statutory definition of "unwarranted hardship" that now appears in NR §8-1808(d)(1) in 2004. Chapter 526, Laws of Maryland 2004.[14] The legislation defined "unwarranted hardship" as a situation in which, in the absence of a variance, "an applicant would be denied reasonable and significant use of the *entire* parcel or lot." (emphasis added). The amendment thus codified the definition of "unwarranted

---

[14] The definition was later incorporated in the critical area regulations. *See* COMAR 27.01.12.01, *adopted in* 40:4 Md. Reg. 347 (February 22, 2013).

23

hardship" developed in *Belvoir Farms*; it also incorporated in that definition the reference to consideration of "the entire parcel or lot" that had previously been added to the statute in the 2002 amendments in response to the *Mastandrea* decision.[15]  In addition, the legislation directed local jurisdictions, in assessing a variance application, to presume that the proposed development does not conform with the "general purpose and intent" of the Critical Area law and placed the burden of proof and burden of persuasion on the applicant to show that the presumption was rebutted.[16]

The legislation was an explicit response to *Lewis* and, in particular, the holdings that confined consideration of the hardship issue to just the part of the property in the buffer and that shifted the burden of proof away from the applicant.  The preamble to the law stated that, "it is the intent of the General Assembly that this Act shall overrule the *Lewis* decision and re-establish critical area variance standards, particularly the historic understanding of unwarranted hardship, that existed until weakened by the Court of Appeals[.]"  Chapter 526, Preamble, Laws of Maryland 2004.

With respect to the definition of "unwarranted hardship," the proponents of the legislation explained that it was designed to require a local board (and reviewing court) to consider whether a proposed development could be accomplished elsewhere on the

---

[15] The 2002 legislation had required a local jurisdiction to consider the "entire parcel or lot" in assessing reasonable use.  NR §8-1808(d)(2) (2002).  That provision was repealed as part of the 2004 amendments and moved into the statutory definition of "unwarranted hardship."

[16] This aspect of the 2004 legislation is discussed in Part II.D. of this opinion below.

property without need for a variance from the Critical Area requirements. In particular, the Chair of the Critical Area Commission testified that one of the key criticisms of the *Lewis* decision that he and the drafters of the 2004 legislation had considered in working on the bill was that the Court had taken away from local officials the latitude to consider "whether a better location for the proposed development existed elsewhere on the site[.]" Testimony of Martin G. Madden, Chair of the Critical Area Commission, concerning Senate Bill 694 (2004); *see also* Maryland Department of Natural Resources Bill Report concerning House Bill 1009 (March 5, 2004). The floor reports for the legislation described the standard in the bill as: "look at the entire parcel to see if there is another reasonably suitable location for the proposed development activity, other than the buffer." Floor Report concerning Senate Bill 694 at pp. 3-4; Floor Report concerning House Bill 1009 at p. 5.[17]

While the Legislature was clearly overruling *Mastandrea's* and *Lewis'* application of the "unwarranted hardship" standard in directing that a local board assess that standard in relation to the entire property, it is also evident that the General Assembly did not intend to convert that criterion into the "taking" standard. In response to an inquiry from the General Assembly about the relationship between the standards articulated in the bill and the "unconstitutional taking" standard, counsel to the General Assembly advised that

---

[17] Senate Bill 694 and House Bill 1009 were identical cross-filed bills designed to overrule parts of the *Lewis* decision. House Bill 1009 was ultimately enacted as Chapter 526, Laws of Maryland 2004. Senate Bill 694 was vetoed by the Governor as duplicative. *See* Laws of Maryland 2004 at pp. 2844-45.

25

"[b]oth the Court of Appeals and the Attorney General's Office ha[ve] indicated that an unwarranted hardship standard such as that found in the language of SB 694 / HB 100[9] is not the same as requiring the showing of an unconstitutional taking before a variance could be granted." Letter of Assistant Attorney General Robert A. Zarnoch, Counsel to the General Assembly, to Senator Norman R. Stone, concerning Senate Bill 694 and House Bill 1009 (March 8, 2004). No change was made to the definition in the bills after the General Assembly was provided with this interpretation of it.

*Summary*

As the foregoing legislative history demonstrates, there has been an ongoing dialogue among the Commission, the Court, and the Legislature concerning the understanding and application of the concept of "unwarranted hardship" in the Critical Area law. The concept was first included by the Commission in its regulations and then articulated and applied by the Court in case law. The Legislature ultimately incorporated the criterion in the statute at the request of the Commission, using the same general articulation as the Court, but disagreeing in how it is to be applied. It is our role now to apply that statutory definition as best we understand it in the context of the 2002 and 2004 amendments of the statute.

Several principles pertinent to this case are apparent. First, this Court has always distinguished the "unwarranted hardship" standard from the standard for an unconstitutional taking. In adopting the same language as used by the Court for the definition of "unwarranted hardship" the General Assembly apparently agrees. Nothing in the legislative history of the 2002 and 2004 amendments that added the phrase

26

"unwarranted hardship" to the statute suggests otherwise. Indeed, when it enacted the definition in 2004, the Legislature was advised by the Attorney General's Office that "unwarranted hardship" was less stringent than a takings standard.

Second, there is no support at all in the legislative history for a reading of the definition of "unwarranted hardship" that requires an applicant to show a deprivation of *all* reasonable and significant use of the actual property. Indeed, there is the opposite. The 2004 position paper from the Maryland Department of Natural Resources refers to the proper standard as "whether the applicant had alternative locations on the property for the proposed use." The floor reports for the 2004 bills described the standard in those bills as: "look at the entire parcel to see if there is another reasonably suitable location for the proposed development activity, other than the buffer." The Chair of the Critical Area Commission for the Chesapeake and Atlantic Coastal Bays described the desired standard as "whether a better location for the proposed development existed elsewhere on the site[.]" The common understanding is that a showing of "unwarranted hardship" is not whether, without the variance, the applicant is denied "all reasonable and significant use" of the property, but whether, without the variance, the applicant is denied "*a* reasonable and significant use" that cannot be accomplished somewhere else on the property.

Finally, as outlined above, this Court has articulated the standard of unwarranted hardship as involving a deprivation of a reasonable and significant use of the property in a number of cases. The 2002 and 2004 amendments, as they related to the unwarranted hardship standard, were enacted to overrule specific holdings in *Mastandrea* and *Lewis* that required a local board to assess that standard only with respect to the portion of a

27

property for which the variance was sought without considering whether the same development could be accomplished elsewhere on the property without a variance. In *Lewis*, this Court reversed a decision by a local board of zoning appeals. The General Assembly clearly preferred the standard applied by the local board – whether an applicant would be denied "*a* reasonable and significant use of the 'entire' lot." *Lewis*, 377 Md. at 420 (emphasis added).

In summary, in order to establish an unwarranted hardship, the applicant has the burden of demonstrating that, without a variance, the applicant would be denied a use of the property that is both significant and reasonable. In addition, the applicant has the burden of showing that such a use cannot be accomplished elsewhere on the property without a variance.

3.      Application of the Unwarranted Hardship Standard

In light of the discussion above, it is evident that the Board applied a correct understanding of the concept of "unwarranted hardship." When the evidence is viewed in the light most favorable to the Board's decision, it is also clear that there was substantial evidence of an unwarranted hardship in this case. The use of a pier or walkway to reach navigable water to exercise the riparian rights associated with the property is a significant use of the property. In the context of this particular property, such a use is reasonable for at least the following reasons:

- As the Critical Area Commission noted in its letter, the property is located in an Intensely Developed Area.

- The area is an existing boating community.

28

- Pursuant to the approvals by the various environmental agencies, there are various conditions on the construction and use of the proposed pier to protect the marshland as well as requirements to undertake certain plantings and other efforts to enhance it.

Finally, it is evident that the Board considered the entire property in assessing this use. As the Board found, the proposed pier was the "most direct access path to navigable waters," and there does not appear to be any better alternative location for the pier on the property.

In our view, there was substantial evidence to support the Board's finding of unwarranted hardship here.

## C.    *Adverse Environmental Impact*

As noted earlier, standard 5 of the Worcester County ordinance requires that "[t]he granting of a variance shall not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Atlantic Coastal Bays Critical Area."  WCC NR §3-111(b)(5).  In addressing that factor, the Board took note – as the Critical Area law encourages[18] – of the approvals that Mr. Schwalbach had received from the Maryland Department of the Environment and the U.S. Army Corps of Engineers for the proposed pier.  The Board stated:

> These agencies provide an extensive review of a wide array of environmental impacts and have determined that this proposed wetland crossing has minimized these potential impacts.  The proposed pier/walkway is only 3' in width which also further reduces the risk of any environmental degradation.

---

[18] *See* NR §8-1808(d)(4)(ii); WCC NR §3-111(d)(4).

As ACT correctly points out, this discussion does not explicitly say that the statutory factor is met. It says that other agencies have determined that the proposed crossing "has minimized" the risk of an environmental impact, which may not be quite the same as "not adversely affect[ing] water quality" or fish, wildlife, or plant habitat. However, in the very next paragraph of its decision, the Board states "the Applicant has satisfied all standards." This means what it says: the Board has found that all standards, including the "not adversely affect" standard, are met.

Substantial evidence supported this finding. At the hearing, Mr. Schwalbach's expert environmental consultant testified that the pier would not have an adverse effect on water quality. He appeared to base this conclusion on the review by the Maryland Department of the Environment and the already extensive conditions imposed on the construction by the Army Corps of Engineers.[19] In the written staff recommendation to

---

[19] These were:

> 1. Within 15 days following project completion, the permittee must provide to the Corps pre-construction and post-construction photographs of the project area within and adjacent to the vegetated wetlands. The pictures must include a reference to the location and date.

> 2. The permittee must use marsh mats if equipment is placed in vegetated wetlands which must be removed immediately following construction of the walkway and pier.

> 3. The permittee must restore all preconstruction elevations and replant impacted wetland areas with native marsh species within the limits of disturbance upon completion of the proposed work.

> 4. The permittee must achieve 85% vegetative cover within remediated areas within one year of completion of all

approve the variance, staff reported that Mr. Schwalbach would be required to mitigate any

environmental impact with new plantings, "based on an amount equal to not less than three

work.  If 85% coverage is not attained, the reasons for failure must be determined, corrective measures must be taken and the area replanted.

5. The wetland restoration area must be maintained, with non-nuisance species, aerial coverage of at least 85% for three consecutive years.  If 85% coverage is not attained, the reasons for failure must be determined, corrective measures must be taken and the area replanted.  During this 3-year timeframe, the permittee must be responsible to submit an annual monitoring report which must document, with photographs and narratives, the condition of the marsh substrate, including the health of the vegetation, and any other related monitoring information including the following:

a) Date of inspection(s).

b) Documentation of species and measurements of vegetative coverage.

c) Documentation of any maintenance performed or required, including any planting of vegetation or soil decompaction.

d) Photographic documentation, in digital form, taken within the same time frame during each monitoring year.

6. Within 30 days of completion of the work, the permittee must submit as-built plans, including latitude/longitude coordinates, of the channelward most point of the structure, to the Corps and must notify the Corps to coordinate a compliance site visit.

7. The permittee must immediately remove any and all debris introduced into the waterway as a result of any construction and should ensure that all debris is properly disposed.

31

times the square footage of the area of any buffer disturbance," and described that he should place these "required plantings" between the improvement and the tidal wetlands to enhance the buffer function in the marsh. Given the lack of contrary evidence, other than generalizations in ACT's letter, there was substantial evidence for the Board to find that Mr. Schwalbach's application had satisfied all standards, including standard 5 concerning the absence of an adverse environmental impact.

**D.      *Conformity with the Purpose and Intent of the Critical Area Program***

As noted earlier, the Critical Area statute provides that, "[i]n considering an application for a variance, a local jurisdiction shall presume that the specific development activity in the critical area that is subject to the application and for which a variance is required does not conform with the general purpose and intent of" the Critical Area Program. NR §8-1808(d)(3)(ii); *see also* WCC NR §3-111(d)(1). The applicant has the burden of proof and burden of persuasion to rebut this presumption and a zoning board is to make written findings as to whether the applicant has done so. NR §8-1808(d)(4).

ACT contends that the Board's decision is inadequate because the Board did not explicitly state that Mr. Schwalbach had overcome the statutory presumption of non-conformity. It argues that the decision must be overturned for that reason. ACT's argument is, at best, technical and superficial.

In the context of the statutory scheme, the presumption of non-conformity requires a local zoning board to demand that an applicant for a variance satisfy all standards for the proposed variance and to find that the applicant has met that burden before it grants a

32

variance.[20]  *See DCW Dutchship*, 439 Md. at 637 (construing presumption to mean that applicant must satisfy all criteria for variance).  It is evident from this record in this case that the burdens of proof and persuasion were placed on Mr. Schwalbach as to all of the standards and that the Board found that he had satisfied those burdens as to each.

While ACT is correct that the Board did not explicitly reference the statutory presumption in its decision, the Board explicitly found that Mr. Schwalbach had "satisfied all standards" and stated its conclusions in detail and in writing as to each standard.  In

---

[20] As the Court of Special Appeals recounted in its opinion in this case, that is how the intermediate appellate court has construed the statute in several cases.  *See* 223 Md. App. at 655-56.  And, as that court explained with respect to this case, satisfaction of the six standards under the County ordinance necessarily involved compliance with the requirements of the State statute.  *Id.* at 656 n.14.

The legislative history also supports this understanding of the statutory presumption.  As discussed above, the presumption of non-conformity was added to the statute as part of the 2004 legislative response to the *Lewis* decision.  The dissenting opinion in *Lewis* criticized the majority opinion's analysis of the burden of proof and burden of persuasion.  *Lewis*, 377 Md. at 455 (Wilner, J., dissenting); *id.* at 465-66 (Wilner, J., dissenting as to disposition of motion for reconsideration).  Advocates for the 2004 legislation urged the General Assembly to pass those bills in order to ensure that the burden of proof – in particular, the burden of persuasion – was placed on the applicant for a variance.  *See, e.g.,* Testimony of Maryland Association of Counties concerning House Bill 1009 (March 9, 2004); Testimony of Chesapeake Bay Commission concerning House Bill 1009 (March 9, 2004); Testimony of Maryland Municipal League concerning House Bill 1009 (March 9, 2004) at p. 1.  The preamble to the 2004 legislation recited the General Assembly's concern that the *Lewis* decision "shifted the burdens of proof and persuasion to local jurisdictions with respect to the denial of a critical area variance application, thus adding burdensome requirements and unnecessary expenses to their consideration of variance applications[.]"  Chapter 526, Preamble, Laws of 2004.  That law amended NR §8-1808(d) to add the provisions concerning the presumption of non-conformity, the burden of proof and burden of persuasion, and the requirement of written findings – provisions that were clearly intended to function together to ensure that the burden of proof remained on the applicant for a variance.

analyzing whether Mr. Schwalbach had satisfied each standard – and not just the one standard on which the lone opponent (ACT) expressed its opposition before the Board – the Board applied a presumption of non-conformity and put Mr. Schwalbach to his proof. The written decision finding that he had satisfied *all* standards allows for no other conclusion than that the presumption of non-conformity had been rebutted. And, as the Circuit Court pointed out, the determination that the application satisfied standard 5, which included a determination that it would be "in harmony with the general spirit and intent" of the Critical Area Program, appears to be indistinguishable from a finding that the variance conforms with the general purpose and intent of the program. In our view, the Board's written decision complies with the requirements of NR §8-1808(d)(3) and (4) concerning the presumption of non-conformity, the burden of proof and burden of persuasion, and the requirement of written findings.

## III

## Conclusion

For the reasons set forth above, we hold:

1.      There was substantial evidence to support the Board's finding that, without the variance, Mr. Schwalbach would have suffered an unwarranted hardship – *i.e.,* he would not be able to exercise the riparian rights associated with the property, a reasonable and significant use that could not be exercised elsewhere on the entire property.

2.      There was substantial evidence to support the Board's finding that the granting of the variance would not adversely affect water quality or the fish, wildlife, or

34

plant habitat within the Critical Area – a finding contained in the Board's analysis of that standard and in its explicit determination that "all standards" had been satisfied.

3.    The Board adequately found that Mr. Schwalbach had rebutted the presumption of non-conformity of the proposed variance when it explicitly determined in writing that he had carried the burden of proof as to all standards governing the proposed variance.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge Battaglia joins in the judgment only.