*West Montgomery County Citizens Association v. Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission*
No. 579, Sept. Term, 2019
Opinion by Leahy, J.

**Administrative Law > Judicial Review of Agency Decision > Montgomery County**

The Maryland Code (2012), Land Use Article ("LU"), § 23-204(d)(1)—which applies to preapplication and preliminary submissions in Montgomery County only—requires the Planning Board to "state the grounds for *disapproval* in the records of the county planning board." (Emphasis added). The statute does not specify what the Planning Board is required to state in approving a preliminary plan.

**Administrative Law > Judicial Review of Agency Decision > Montgomery County**

Section 50-35 of the Montgomery County Subdivision Regulations, under which the Applicant elected to have her Preliminary Plan reviewed, likewise does not explicitly direct the Planning Board to render written findings on the criteria for approving a preliminary plan. Section 50-35 does, however, set limitations on the Planning Board's authority to approve a preliminary plan and requires the Planning Board to consider certain factors.

**Administrative Law > Judicial Review of Agency Decision > Montgomery County**

We hold that, for purposes of enabling judicial review, if the administrative record and the Planning Board's final determination reflect that the Planning Board considered all of the factors and conditions required by the applicable provisions of the Land Use Article and the Montgomery County Subdivision Regulations in approving a preliminary plan, the Board's final determination need not restate all facts upon which it rests.

**Administrative Law > Sufficiency of Agency Determination > Montgomery County**

The Planning Board was required to do no more than determine whether the Preliminary Plan fulfilled the requirements of § 50-35 of the Subdivision Regulations.

Circuit Court for Montgomery County
Case No. 451996-V

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 579

September Term, 2019
_____

WEST MONTGOMERY COUNTY CITIZENS
ASSOCIATION

v.

MONTGOMERY COUNTY PLANNING
BOARD OF THE MARYLAND-NATIONAL
CAPITAL PARK AND PLANNING
COMMISSION
_____

Kehoe,
Leahy,
Adkins, Sally D.
     (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Leahy, J.
_____

Filed: October 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

The West Montgomery County Citizens Association ("WMCCA"), appellant, along with eight neighboring homeowners (the "Neighbors"), filed the underlying petition for judicial review challenging the decision of the Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission (the "Planning Board"), appellee, approving a preliminary plan filed by Sara A. Vazer (the "Applicant"), co-appellee. The Applicant proposed to subdivide a 2.77 acre property on Glen Mill Road in Montgomery County (the "Property") into two lots with the intention of building one residence on each.

The Planning Board Staff ("Staff") recommended conditional approval of the preliminary plan in a report posted on May 25, 2018. Staff concluded that the proposed subdivision met the applicable requirements contained in the Subdivision Regulations, Chapter 50 of the Montgomery County Code ("Subdivision Regulations" or "Chapter 50"),[1] and in the Montgomery County Forest Conservation Law, Chapter 22A of the Montgomery County Code. ("Forest Conservation Law" or "Chapter 22A"). The WMCCA and the Neighbors filed written objections to the preliminary plan with the Planning Board.

---

[1] On November 15, 2016, the Montgomery County Council adopted Ordinance No. 18-19, which replaced Chapter 50 in its entirety, effective February 13, 2017. The ordinance provided that any preliminary plan application that was "filed and certified as complete" before the effective date of the ordinance could, "at the applicant's option, be reviewed under the Subdivision Regulations in effect when the application was submitted." Because Applicant filed her preliminary plan application on February 22, 2016, she was able to, and did, opt to have it reviewed under the Subdivision Regulations in effect prior to February 13, 2017.

The Planning Board held a public hearing to consider the application and the associated Preliminary Forest Conservation Plan on June 7, 2018. WMCCA and the Neighbors testified in opposition, but the Planning Board ultimately voted to approve the preliminary plan and accompanying Preliminary Forest Conservation Plan, with conditions. On July 2, 2018, the Planning Board issued Resolution No. 18-045 (the "Resolution"), which certified the Planning Board's conditional approval and described the Planning Board's related findings.

WMCCA and the Neighbors filed separate petitions for judicial review in the Circuit Court for Montgomery County. The Planning Board filed a motion to consolidate, which the court granted on November 1, 2018. The court held a hearing on February 8, 2019 and subsequently affirmed the decision of the Planning Board in a written decision issued on April 29, 2019.

Although the Neighbors did not appeal from the court's decision affirming the Planning Board, WMCCA timely appealed and presents three issues for our review:

"I. In Resolution MCPB No. 18-045, did the Board make findings and conclusions sufficient to permit adequate judicial review of the validity of the plan the following on three claims made by WMCCA [sic]?"

"A. Proper stream buffer standards and calculations under the applicable environmental guidelines were not employed by Staff, resulting in erroneous approval of the Application."

"B. Proper wetland buffer standards and calculations under the applicable environmental guidelines were not employed by Staff, resulting in erroneous approval of the Application."

"C. The record fails to show that the Application is in compliance with the Piney Branch Sewer Agreement Covenant."

2

"II.    Was the Board's plan approval free of legal error with respect to WMCCA's three claims of violation of controlling environmental regulations?"

"III.    Did the Applicant demonstrate the requisite 'undue hardship' necessary for the requested tree variance?"

For the reasons that follow, we affirm.

## BACKGROUND

### The Property

The Property is located on Glen Mill Road, which is "classified as a Rustic Road." It is zoned RE-1[2] and is situated within an area of Montgomery County governed by the *2002 Potomac Subregion Master Plan* (the "Master Plan"). The Property lies within the Watts Branch watershed and a portion of the Piney Branch Stream crosses the Property, placing it within the Piney Branch Special Protection Area ("SPA").

As stated in the Staff Report, "[t]he Piney Branch stream flows from the north, under Glen Mill Road, and enters the [] Property from a box culvert under Glen Mill Road." The report further describes the Property as

> slop[ing] upwards from Glen Mill Road and the Piney Branch stream valley and level[ing] out in the southwest corner of the Property[.] The Property contains a total of 1.54 acres of forest. Within this forested area and within 100-feet outside of the property lines, there are 40 trees equal to or greater than 24" diameter breast height (DBH). Of those 40 trees, 14 are 30" DBH or greater (specimen tree).

---

[2] The RE-1, or Residential Estate-1, zone is a Residential Detached zone. Montgomery County Zoning Ordinance, Chapter 59 of the Montgomery County Code ("Zoning Ordinance"), § 59-4.4.6 (2014). Section 4.4.6(A) specifies that the "intent of the RE-1 zone is to provide designated areas of the County for large-lot residential uses" and the "predominant use is residential in a detached house." The minimum lot area for detached houses in the RE-1 zone is 40,000 square feet. § 59-4.4.6(B).

3

***

> In addition to the Piney Branch stream, there is an existing hydraulically isolated pond located along the eastern side of the Property adjacent to the stream. The pond does not directly empty into the stream and is separated from the Piney Branch stream with a small berm. The pond outfalls onto the [] Property immediately to the south[.] In addition to the stream and pond, there is a very small wetland area associated with the stream measuring approximately 175-square feet in size located southeast of the pond.

As we explain in further detail below, WMCCA claims the wetland area is much larger because, WMCCA contends, the pond cannot be considered an area that is isolated from the stream.

### The Preliminary Plan Application

On February 22, 2016, the Applicant filed an application for approval of Preliminary Plan No. 120160180 (the "Preliminary Plan") for the subdivision of the Property, which was an unplatted and unimproved parcel, 2.77 acres in size. The purpose of the Preliminary Plan was to create two lots that could accommodate two single family homes.

Under the proposed subdivision, Lot 1 would be 1.00 acre, or 43,602 sq. ft., and Lot 2 would be 1.77 acres, or 76,994 sq. ft. The lots would be accessed through a shared driveway from a single access point off of Glen Mill Road. The Applicant requested a variance from Chapter 22A to remove four trees from the Property and to "impact" the critical root zone of one other tree.

The Applicant had obtained a sewer connection for the Property, but due to restrictions under the Piney Branch SPA, could not obtain approval for an additional sewer hookup for Lot 2 without signing a Piney Branch Sewer Agreement Covenant. On May

4

30, 2017, Applicant signed the Covenant, agreeing to "protect the water quality and minimize environmental disturbance" on the Property in accordance with the Piney Branch sewer development recommendations developed by the Piney Branch Technical Advisory Group and the Montgomery County Department of Environmental Protection ("MCDEP").

On April 1, 2016, the Neighbors, "all contiguous and several adjacent homeowners," wrote the Planning Board to express their objection to the two-lot subdivision of the Property. While expressing, as WMCCA puts it, "qualified receptiveness" to a one-lot subdivision, the Neighbors listed several reasons for their opposition to the proposed two-lot subdivision. Notably, the Neighbors contended that "[e]nvironmental constraints on the [] Property in this *Piney Branch Special Protection Area* . . . do not support creating two irregularly-shaped lots"; "[t]his two-lot plan proposes a pattern of development that is inconsistent with the [] Master Plan and is incompatible with the established surrounding residential community"; "[t]wo sewer connections, much less crossing a wetland buffer, the stream valley, and the stream itself to make *any* connection, are at odds with the restricted access for this environmentally sensitive area"; and "[t]he existing forest will be seriously compromised, all the more so with two lots[.]"

Subsequently, the Applicant amended and resubmitted her Preliminary Plan, keeping the proposed two-lot subdivision.

On November 9, 2017, the Neighbors wrote the Planning Board a second time to oppose the resubmitted Preliminary Plan, asserting that, "the few changes that have been made to the Plan are completely unresponsive to the Neighbors' expressed concerns." They explained in a detailed seven-page letter, with exhibits, why "[f]actoring together all

of the[] environmental resources that dominate the [] Property, it [wa]s obvious that the []

Property cannot support two buildable lots."

The WMCCA sent its written objection to the Planning Board a few days later.

WMCCA pointed to several characteristics of the Property:

> This Piney Branch stream channel runs through the 2.77 acre parcel which lies entirely within the Piney Branch Special Protection area. Environmental constraints impact the entire parcel and include the stream bed, 100 yr. flood plain, wetlands, stream buffer, and 2 areas of steep slopes each with more than 25% slopes. It is heavily wooded – 1.54 acres are forest and it contains 26 specimen and significant trees.

WMCCA contended that "each of these [characteristics], and especially when taken

together, so constrain the buildable area of the parcel that 2 houses cannot be constructed."

WMCCA's main points were:

1. The Stream Buffer Must Be Expanded to Meet SPA Requirements (because the 125' stream buffer was too narrow and should be expanded to at least 150' due to slopes on the property in excess of 25%).

2. Wetlands Must Be Further Delineated (because the pond cannot be considered an "isolated farm pond" and should have been delineated as wetlands, requiring an expanded buffer within the SPA).

3. The Application Fails to Demonstrate Compliance with the Provisions of the Required Piney Branch Sewer Agreement Covenant (because the application does not identify dedication of a "buffer corridor" of at least 100 feet from the stream).

4. The Proposal Fails to Meet the Section 22A-21 Requirements for a Tree Variance (because Applicant cannot demonstrate that she would suffer "unwarranted hardship" if she could not remove four of the largest specimen trees).

**Agency and Staff Review**

On April 14, 2017, the Rustic Roads Advisory Committee unanimously recommended approval of the Preliminary Plan, based on a determination that the "use of a single driveway to serve two residences [would] act to minimize potential visual impacts" on Glen Mill Road.

The Department of Permitting Services for the county ("MCDPS"), in a letter dated May 25, 2017, indicated that it had reviewed the Water Quality Inventory for the Preliminary Plan and determined that it was "acceptable," but that certain items would "need to be addressed during the detailed sediment control/stormwater management plan stage[.]" On April 5, 2018, MCDPS further approved the Preliminary Plan on the basis of "Fire Department [a]ccess and [w]ater [s]upply." As stated in a letter dated March 1, 2018, the Montgomery County Department of Transportation had reviewed the Preliminary Plan and recommended approval, subject to certain comments.

In a letter dated April 29, 2018, MCDEP informed the Planning Board that it had reviewed the Applicant's variance request under the relevant provisions of the Forest Conservation Law. Making the necessary findings under Chapter 22A, the agency recommended that the "granting of the variance in this case would not confer a special privilege on this [A]pplicant" and that "the disturbance of trees, or other vegetation, as a result of development activity is not, in and of itself, interpreted as a condition or circumstance that is the result of the actions by the [A]pplicant." MCDEP recommended that the Planning Board find that the Applicant qualified for a variance, "conditioned upon meeting all 'conditions of approval' pertaining to variance trees recommended by [Staff],

7

as well as the [A]pplicant mitigating for the loss of resources due to removal or disturbance to trees[.]"

Staff, in turn, recommended approval of the Preliminary Plan, with conditions, in a report completed on May 25, 2018. Among the conditions was a requirement that the Applicant comply with the conditions of approval for the Preliminary Forest Conservation Plan, to be approved as part of the Preliminary Plan, and that the Planning Board accept the recommendations of the other county agencies.

Staff made five major findings in the report. First, Staff determined that the Preliminary Plan "substantially conforms with the recommendations of the *2002 Potomac Subregion Master Plan*[,]" which "provides no specific recommendations for the [] Property other than maintaining the RE-1 zoning which would continue the large lot residential appearance of the planning area." Second, Staff found that "[p]ublic facilities will be adequate to support and service the area of the approved subdivision." Third, Staff concluded that the "sizes, widths, shapes and orientations [of the proposed lots] are appropriate for the location of the subdivision, taking into account the recommendations of the Master Plan, the recommendations of the Rustic Road Advisory Board as well as other County Agencies, and for the building type (single family homes) contemplated for the Property." Fourth, Staff found that "[t]he Application satisfies all the applicable requirements of the Forest Conservation Law[.]" Lastly, Staff noted that the "Preliminary Plan received an approved water quality inventory from the Montgomery County Department of Permitting Services[.]"

8

Staff also examined the Applicant's variance request and observed that the impacts to the five trees at issue for the construction on the lots were "unavoidable," as the "location of the proposed homes ha[d] been moved as far as possible out of and away from the environmental buffers on t[he] Property." As a result, Staff concluded that "not being able to request a variance to remove these 4 trees and impacting 1 other would constitute an unwarranted hardship on this Applicant to develop the [] Property." After making the variance findings required by the Forest Conservation Law, Staff recommended approval of the variance.

In another section of the report, entitled "Citizen Correspondence and Issues," Staff indicated that it had received the three letters from the Neighbors and WMCCA in opposition to the Application. Staff attached the letters to its report, noting that the concerns focused on "primarily environmental issues, as well as lot pattern, and the number of allowed sewer connections." Staff proceeded to address the environmental concerns that "the stream buffer is incorrect[,]" "the forest will be negatively impacted by the two lot subdivision[,]" and "the Application fails to comply with the provisions of the Piney Branch Sewer Agreement Covenant." Staff explained that, "[a]s specified in Table 1, page 8 of the Environmental Guidelines, the stream buffer for a Use Class I/I-P stream is 100 feet." Because the Watts Branch Stream is a Use Class I/I-P stream, Staff continued, the Applicant's proffered 125-foot stream buffer was accepted and approved. Staff referenced the extensive findings contained in the report to support its determination that "the Application [met] all the requirements of Chapter 22A which establishes the requirements pertaining to the preservation of forest in Montgomery County." Lastly, Staff explained

9

that MCDEP was allowing a single connection to public sewer "[b]ecause the Piney Branch Sewer Agreement Covenant ha[d] been filed in the Land Records[,]" and was "allowing an additional sewer connection . . . based [on] the fact that the [] Property granted a portion of the easement necessary to construct the Piney Branch Trunk Sewer."

Next, Staff addressed the remaining concerns, which included the lot pattern, the harmony of the development, house spacing, and park proximity. Staff noted that the "lots proposed in th[e] Application are not as extreme a shape as a flag lot, but are similar to some of the irregular shape lots to the south of the [] Property." As to the concerns "regarding the Subdivision Regulations['] purpose to create 'harmonious development and promote the health, safety, and welfare' in Section 1.1[,]" Staff stated that the "intent of the Subdivision Regulations is to achieve the purposes stated in Section 1.1 via the tools provided in other sections of the Subdivision Regulations . . ., and by extension, the Zoning Ordinance." Thus, "[o]nce these adopted standards have been achieved, the Subdivision Regulations and Zoning Ordinance consider any application to have met the purposes stated in their introductory sections." Turning to house spacing, Staff expounded that, "[u]nder the current plan, the houses will be approximately 50 feet apart at their nearest point" which would "meet all of the setback requirements in the zoning ordinance." Finally, although the "surrounding neighbors suggested that there could be a public interest" due to the Property's proximity to Glen Hills Local Park, Staff stated that the Parks Department "ha[d] not provided Staff with comments opposing th[e] Application, nor did they express interest in acquisition for public land."

## Proceedings before the Planning Board

The Planning Board held a hearing on the application for approval of the Preliminary Plan on June 7, 2018. Staff gave a presentation and concluded by recommending approval of the Preliminary Plan with conditions. The Neighbors then testified and presented their concerns about the Preliminary Plan. Next, Susanne Lee, a representative of WMCCA, presented the four issues that the WMCCA was most concerned about: (1) the "stream buffer and how it's calculated"; (2) the "wetlands and how they are calculated, and their buffers"; (3) "[t]he covenant which the [Applicant] had to enter into, . . . the Piney Branch Sewer Agreement," which "adds additional requirements in the 200-foot buffer"; and (4) "how [the Planning Board was] applying the unwarranted hardship exception for variances under the Forest Conservation statute." Ms. Lee presented photographs in support of her points. For example, she presented photographs of the vegetation in the area around the pond showing "it's a supersaturated area, . . . it's full of water, and [] it's got vegetation that you find in a wetlands area." Ms. Lee relied substantially on the Guidelines for Environmental Management of Development in Montgomery County (the "Environmental Guidelines"), a publication approved by the Planning Board in 2000, for her arguments regarding the stream buffer and the wetlands.

Following WMCCA's presentation, the Planning Board chair asked Staff to address the four points Ms. Lee presented. Doug Johnson, whose job title is "Environmental Reviewer," explained how the Staff obtained their stream buffer calculations and stated, "I believe that [] it's probably just a different interpretation of what we have in the Environmental Guidelines which is causing some of this confusion." Regarding the

11

wetlands, Mr. Johnson said he "would have to defer to the Applicant's wetland expert to answer those questions." However, Mr. Johnson explained:

> In most cases when wetlands appear on a Forest Conservation Plan they are within a protected stream buffer, so we're not overly concerned about being technically correct in defining the wetland, and then applying the 25-foot buffer that the State requires because the area is already protected as it is. It is going to go into easement anyway.

Alan Soukup from MCDEP also testified that he had evaluated whether the sewer connection was compliant with applicable environmental rules. He explained that, according to the plan worked out through the Washington Suburban Sanitary Commission ("WSSC"),[3] the Applicant was to "provide a single main extension connection within the existing right-of-way of the sewer line, and then when it gets up out of the flood plain then it bifurcates into two service connections." Following further discussion about the sewer connection, the Planning Board asked about the covenant, and Mr. Soukup explained that the 200-foot buffer Ms. Lee mentioned was only "encouraged" in the covenant agreement, which "unfortunately, perhaps [] leaves it in the hands of whoever is deciding what is going to be allowed or not allowed on this property."

Finally, counsel for the Planning Board, Matthew Mills, responded to Ms. Lee's concern about the unwarranted hardship standard, noting his beliefs that the standard she proffered did not apply to the Planning Board's decision. He asserted that "it is not self-

---

[3] Mr. Ryan Sigworth, Senior Planner, added that under the Applicant's initial plan, "the hookup to the trunk line would have required stream crossings, and more, and it would have been more environmentally detrimental." The Applicant, he said, had to pay for a second WSSC review since the redesign "had radically changed in terms of the sewer extension[.]"

12

inflicted hardship to ask for something that is permissible under the Zoning Ordinance or the Subdivision Regulations."

Counsel for the Applicant presented next, and the Applicant, as well as the Applicant's civil engineer and environmental scientist, were present to answer questions. At the close of counsel's presentation, a commissioner expressed her opinion that the Planning Board "should not approve two lots here" because the orientation of the proposed subdivision would lead to neighboring properties that are "too close to each other." The vice-chair expressed a contrary opinion, stating, "I don't think that[,] as much as I would prefer a different solution[,] that we should reject the design of this house when it complies with all the requirements, these two lots, it complies with all the requirements of the law."

At the close of the hearing, the chair moved to approve the Preliminary Plan "with the additional condition that the building line be moved back 10 more feet" to create a setback of 45 feet for Lot 1, instead of the minimum 35 feet required by the Subdivision Regulations, and "to ensure that at the time of final Forest Conservation Plan that the screening is maximized consistent with the [plan and] the other considerations that go into the afforestation[.]" The Planning Board voted unanimously in favor of the motion.

**The Planning Board's Resolution**

The Planning Board issued Resolution No. 18-045 approving the Preliminary Plan with conditions, on July 2, 2018. The Resolution set forth the conditions for approval, including requirements that the Applicant:

- Comply with the conditions of approval for the [Preliminary Forest Conservation Plan], which the Planning Board approved as part of the Preliminary Plan, including

13

that Applicant must record a Category I Conservation Easement over all areas of forest retention;

- "[S]ubmit a five-year Maintenance and Management Agreement approved by the M-NCPPC Office of General Counsel" prior to the start of any demolition, clearing, grading, or construction on the []Property;

- Comply with each of the recommendations by the Montgomery County Department of Transportation;

- Show on the record plat all necessary easements, including all common ingress/egress and utility easements, as well as "a thirty-five (35) feet of dedication from the centerline of Glen Mill Road along the [] Property's entire frontage";

- Comply with each of the recommendations set forth by MCDPS "in its Final Water Quality Inventory letter dated May 25, 2017"; and

- Include the 45-foot rear yard building restriction line on Lot 1 that had been discussed during the hearing prior to the submittal of a Certified Preliminary Plan and Record Plat.

The Resolution noted that the Planning Board, "having considered the recommendations and findings of its Staff as presented in the hearing and as set forth in the Staff Report," "hereby adopts and incorporates [the Staff Report] by reference." The Planning Board then set forth its findings, starting with its determination that the Preliminary Plan "substantially conforms to the Master Plan," which "provides no specific recommendations . . . other than maintaining the RE-1 zoning [that] would continue the large-lot residential appearance of the planning area." The Planning Board further determined that the Preliminary Plan also "meets all applicable sections of the Subdivision Regulations" expounding that

> [d]ue to the topography and other environmental conditions on the [] Property, the area most suitable for buildings is the flatter area on the southwest corner of the Property. This location for homes enables gravity feeding of the proposed public sewer extension. Furthermore, this building

14

location pushes the homes away from the Glen Mill Road, which is a goal and recommendation of the Rustic Road Advisory Board.

While these lots are irregularly shaped, there are other irregular shaped lots in the vicinity of similar size. The Planning Board finds that the lot shapes remain in keeping with the character of the neighborhood.

The Planning Board concluded that the Preliminary Plan satisfied the applicable requirements of the Forest Conservation Law. To meet the "reforestation/afforestation requirement of 0.46 acres," the Planning Board noted that the Applicant proposed to "install[] afforestation plantings of 0.28 acres within the stream buffer as required under Section 22A-12(e)(3) . . . and submit[] a fee-in-lieu payment for the remaining 0.19 acres." The Planning Board then articulated the findings necessary to grant the Applicant the requested variance to impact the five trees. In particular, the Planning Board found that the variance was "not based on conditions or circumstances which are the result of actions by the Applicant"; rather, it was "based upon the existing site conditions, current health conditions of the trees, and necessary design requirements of th[e] preliminary plan application." Moreover, the Planning Board noted that the three trees "within the alignment of the proposed entry drive" and another "located adjacent to the proposed house on Lot 1 . . . are in declining health and the impacts of construction will only accelerate their decline, causing these trees to eventually become hazard trees."

**Proceedings in the Circuit Court**

The Neighbors and the WMCCA filed separate petitions for judicial review in the circuit court under Maryland Rules 7-202 and 7-203.[4] Sara Vazer and the Planning Board filed responses under Rule 7-204, noting their intention to participate in the actions. The Planning Board filed a motion to consolidate the cases, which the court granted on November 2, 2018.

The court received memoranda from the Planning Board, the Applicant, the Neighbors, and WMCCA. Following a hearing on February 2, 2019, the court took the matter under advisement. On April 29, 2019, the court issued a written opinion and order affirming the Planning Board's decision.

In her written opinion, the judge determined that the Planning Board's Resolution was adequate for purposes of meaningful judicial review and rejected as "without merit" WMCCA's allegation that the Planning Board is required to provide a point-by-point refutation to the challenges to the Preliminary Plan. The judge, quoting extensively from the Staff Report and from the proceedings before the Planning Board, concluded that "[t]here is substantial evidence in the record that would enable a reasonable mind to understand how the Planning Board came to [the] conclusion" that the Preliminary Plan adequately protected the Property's stream buffers and steep slopes. The judge also

---

[4] Though standing was not contested below, we note that the Neighbors and WMCCA had standing to request judicial review of the Planning Board's decision pursuant to Maryland Code (2012, 2016 Supp.), Land Use Article ("LU"), § 23-401(a)(1)(ii), which provides that, in Montgomery County, "judicial review may be requested by . . . a person or municipal corporation that appeared at the hearing in person, by attorney, or in writing[.]" WMCCA is a "person" within the definition provided in LU § 14-101(k).

16

deferred to the Planning Board's determination regarding the farm pond located on the Property, and noted that Applicant's expert's submission dated March 6, 2018 contained in the record "was unrebutted as the Petitioners did not offer their own expert to present opinion or testimony to the Planning Board at the hearing." Finally, in regard to the variance, the judge decided that, "in light of the considerable deference that is owed to the Board's factual findings and to its interpretation of the statute it is charged with implementing, this court will not disturb the Board's decision as to the unwarranted and self-created hardship criterion."

Although the Neighbors elected not to appeal the court's decision, WMCCA timely noted an appeal to this Court on May 23, 2019.

## DISCUSSION

### Standard of Review

In an appeal from judicial review of an agency action, we look through the decision of the circuit court and review the agency's decision directly. *Clarksville Residents Against Mortuary Def. Fund, Inc. v. Donaldson Props.*, 453 Md. 516, 532 (2017) (citation omitted). Our review of the Planning Board's decision to approve the Preliminary Plan is "limited to determining if there is substantial evidence in the record as a whole to support the [Planning Board's] findings and conclusions, and to determine if the [Planning Board's] decision is premised on an erroneous conclusion of law." *Id.* (citation omitted). In determining whether there is "substantial evidence," we must "decide 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Id.* (citation omitted). We cannot substitute our judgment for that of the Planning Board in reviewing

its findings of fact. *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 293-94 (2017) (citation omitted). We owe less deference to the Board's legal conclusions and "give considerable weight to the agency's interpretation and application of the statute which the agency administers." *Mayor of Rockville v. Pumphrey*, 218 Md. App. 160, 194 (2014) (citation and quotation marks omitted). "We are under no constraint, however, to affirm an agency decision premised solely upon an erroneous conclusion of law." *Lillian C. Blentlinger*, *LLC*, 456 Md. at 293 (citation omitted).

In addition, "a reviewing court may not uphold an agency's decision if a record of the facts on which the agency acted or a statement of reasons for its action is lacking." *Becker v. Anne Arundel Cty.*, 174 Md. App. 114, 138 (2007). The Planning Board's "[f]indings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Id.* at 139 (citation omitted).

## I.

### Adequacy of the Resolution

### A. The Parties' Arguments

WMCCA asserts that the Planning Board "failed to make findings and conclusions sufficient to permit adequate judicial review of the validity of the [Preliminary Plan] on three issues raised by WMCCA."[5] WMCCA challenges the Planning Board's Resolution

---

[5] WMCCA states that, before the Planning Board, it first asserted that the Applicant's 125-foot stream buffer was "inaccurate, resulting in too narrow a buffer in this case, because the Property is in the Piney Branch [SPA,]" and "[u]nder SPA standards, the stream buffer is at least 150 feet due to slopes on the Property in excess of 25%, and substantially more along much of the buffer." Second, WMCCA argued that the "isolated farm pond" was not a pond, but a wetland, which required an expanded wetland buffer that

18

on the basis that these three "potentially dispositive" or "material" issues were not addressed, "wholly apart from being adequately enough resolved to permit meaningful judicial review." Although WMCCA claims that the issues provide reason to invalidate the Preliminary Plan, WMCCA emphasizes that the "point is that the Resolution, completely lacking even a mention of WMCCA's invalidity claims, simply does not permit a reviewing court to address WMCCA's claims properly, as the Board has not presented the court with grounds the [c]ourt can review for sustaining the Board's decision on three equally dispositive contested issues."

The Planning Board "does not dispute that it was responsible, in approving the Application, to provide a 'statement of reasons for its action' based on 'a record of the facts,' and that its Resolution could not simply repeat 'statutory criteria, broad conclusory statements, or boilerplate.'" The Planning Board asserts, however, that its Resolution, which "expressly incorporated the Staff Report, was far from perfunctory and more than adequately addressed all necessary findings." Moreover, the Planning Board argues, it "was not obligated, independently of its responsibilities to make adequate findings of fact and conclusions of law, to include a point-by-point refutation of [WMCCA's] claims in its Resolution."

---

would prohibit development in a large portion of the area designated for the second house. Third, WMCCA asserted that the covenant the Applicant recorded "obliged [her] to identify and dedicate a 'buffer (corridor)' of at least 100 feet from the stream where . . . vegetation is not disturbed or maintained" and imposed guidelines to create a secondary buffer of 200 feet.

19

The Applicant responds that the Planning Board's decision and resolution "more than adequately addressed all necessary findings of fact and conclusions of law to warrant approval of the Preliminary Plan in a manner that enables meaningful judicial review." In the Applicant's view, "[t]he problem for [WMCCA] is that they can neither refute the existence of substantial evidence in the record regarding these issues nor can they overcome the deferential standard of review that must be afforded the Board in its ultimate agreement with Technical Staff on the contested issues." The Applicant further asserts that WMCCA's "so-called 'dispositive contested issues' were in fact covered in the analysis and detailed recommendations and findings contained in the Technical Staff Report[,]" and that it was not improper for the Planning Board to rely on the report.

**B. Analysis**

Because this Court cannot uphold the Planning Board's decision "if a record of the facts on which the agency acted or a statement of reasons for its action is lacking[,]" we recognize that remand may be necessary if the Board, in approving the Applicant's preliminary plan, failed to articulate "the basis of the agency's action." *Becker*, 174 Md. App. at 138-39. An agency's written findings "must at least be sufficiently detailed to apprise the parties as to the basis for the agency's decision." *Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. v. Maryland Pub. Serv. Comm'n*, 227 Md. App. 265, 284 (2016) (citation omitted), *aff'd sub nom. Accokeek, Mattawoman, Piscataway Creeks Cmty. Council, Inc. v. Pub. Serv. Comm'n of Maryland*, 451 Md. 1 (2016). As we explained recently,

> The requirement that an agency make meaningful findings of fact exists in part to protect the fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings. The opportunity for "meaningful" review is not necessarily an opportunity for exhaustive review of every possible basis for a petitioner's challenge.

*Id.* at 284 (citations and quotation marks omitted).

In *Mid-Atlantic Power Supply Association v. Maryland Public Service Commission*, this Court considered whether the Maryland Public Service Commission complied with a statute that provided, in part, that "the Commission shall consider" certain enumerated factors. 143 Md. App. 419, 436 (2002). In support of its argument "that the words 'the Commission shall consider' . . . requires the Commission to consider and discuss each of that subsection's enumerated factors" before making a decision, the appellant relied on *Ocean Hideaway Condominium Association v. Boardwalk Plaza Venture*, 68 Md. App. 650 (1986). *Id.* at 437. We distinguished *Ocean Hideaway Condominium Association* on the basis that the ordinance at issue in that case provided that the board "shall render a finding of fact on each of the nine (9) standards stated . . . above." *Id.* By contrast, the statute before us in *Mid-Atlantic Power Supply Association* did "not state that the Commission is to render a finding as to each of that subsection's factors" in making its decision; rather, the Commission only had to "consider" the enumerated factors and was not required to state its findings as to each of the factors. *Id.* at 438. Accordingly, we held that it was "sufficient if the record supports the conclusion that the Commission considered these factors." *Id.* at 439 (citation omitted).

21

WMCCA does not point to, nor can we find, a provision or statute requiring the Planning Board to render specific findings of fact related to the approval of the Preliminary Plan. The Maryland Code (2012), Land Use Article ("LU"), § 23-204(d)(1)—which applies to preapplication and preliminary submissions in Montgomery County only— requires the Planning Board to "state the grounds for *disapproval* in the records of the county planning board." (Emphasis added). The statute does not specify what the Planning Board is required to state in approving a preliminary plan. Section 50-35 of the Subdivision Regulations, under which the Applicant elected to have her Preliminary Plan reviewed, likewise does not explicitly direct the Planning Board to render written findings on the criteria for approving a preliminary plan. Section 50-35 does, however, set limitations on the Planning Board's authority to approve a preliminary plan and requires the Planning Board to consider certain factors. For example, § 50-35(k) provides, "[t]he Planning Board must not approve a preliminary plan of subdivision unless the Board finds that public facilities will be adequate to support and service the area of the proposed subdivision." Similarly, § 50-35(l) states, "[i]n determining the acceptability of a preliminary plan submitted under this Chapter, the Planning Board must consider the applicable master plan, sector plan, or urban renewal plan."

We hold that, for purposes of enabling judicial review, if the administrative record and the Planning Board's final determination reflect that the Planning Board considered all of the factors and conditions required by the applicable provisions of the Land Use Article and the Montgomery County Subdivision Regulations in approving a preliminary plan, the Board's final determination need not restate all facts upon which it rests. As we detail

22

further below, the Planning Board in this case addressed all of the statutory requirements for approving the Preliminary Plan in the Resolution. The record demonstrates that the Planning Board also considered the arguments made by WMCCA that do not fall within the confines of the statutory requirements provided by § 50-35 of the Subdivision Regulations. Moreover, the Staff Report, which the Planning Board expressly adopted and incorporated into the Resolution, contained findings that specifically addressed WMCCA's concerns. *See Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 110 (2009) ("It is not unreasonable for the Planning Board to rely on a Staff Report, as the Planning Board did in this case, if the Staff Report is thorough, well conceived, and contains adequate findings of fact."). Although the Resolution itself does not squarely refute each of WMCCA's concerns, we conclude that the administrative record, including the Planning Board's Resolution, is more than adequate for purposes of enabling judicial review.

## II.

## Applicability of the Environmental Guidelines

### A. The Parties' Arguments

WMCCA argues next that the Planning Board's approval of the Plan was "legal error due to one or more of three independent violations of controlling environmental regulations." WMCCA states that the "supplemental discussion" of its claims of Preliminary Plan invalidity is "fundamentally beside the point, because th[is] Court should remand solely on the obvious deficiency of the Resolution without opining on WMCCA's claims of Plan invalidity." Nonetheless, WMCCA repeats its assertions that "Staff did not

23

employ proper stream buffer standards and calculations, resulting in erroneous approval of the Application"; "Staff did not employ proper wetland buffer standards and calculations, resulting in erroneous approval of the Application"; and "[t]he Plan cannot be approved due to its inconsistency with the Piney Branch Sewer Agreement Covenant."

With regard to stream buffers, WMCCA contends that Staff erred in calculating the stream buffer pursuant to the general Environmental Guidelines, rather than the SPA standards, even though the Property falls within the Piney Branch SPA. WMCCA asserts that the wetland buffer analysis was incorrect because the "pond" on the Property is actually a wetland, which would lead to an enlarged buffer. Finally, WMCCA argues that "the Applicant did not comply with the Piney Branch Sewer Agreement Covenant that she entered into" and the "defect was ignored by both [S]taff and the Board[.]"

The Planning Board responds that the stream buffer and wetland buffer were correctly determined. The Planning Board contends that it "accepted the Planning Department-approved stream buffer in a manner fully consistent with the Forest Conservation Law and a reasonable interpretation of the Environmental Guidelines." In addition, the Planning Board states that the wetland buffer was a "perfectly reasonable application of the Environmental Guidelines and supported by substantial evidence in the record." The Planning Board emphasizes that the Environmental Guidelines "are not regulations—they are 'a compilation of existing policies and guidelines that affect the protection of sensitive natural resources during the development process.'" Because the Environmental Regulations provide that "[t]he Planning Board at their discretion may approve, waive, or amend staff recommendations," the Planning Board contends that the

24

guidelines are mere "guidelines for Planning Department Staff that may be applied with a degree of flexibility and are not strictly binding on the Planning Board." With respect to the covenant, the Planning Board states,

> Given that nothing in the Covenant or the attached "Piney Branch Sewer Agreement Recommendations" states that the Planning Board is responsible for enforcing the instrument, . . . it was entirely proper, and supported by substantial evidence in the record, for the Board to incorporate the Planning Department's analysis of the issue into the Resolution by reference and otherwise refrain from attempting to arbitrate what amounts to a third party agreement.

Applicant, in her separate briefing, contends that WMCCA's "assertion that the wetlands buffer applied in this case was insufficient and should have been subject to expansion beyond the 25-foot State defined buffer as per the Guidelines, is not supported by the evidence." Applicant similarly contends that WMCCA's "assertion that the methodology employed by Technical Staff to calculate the stream buffer did not comport with the Guidelines is incorrect and not supported by the evidence of record in this case." Applicant argues that WMCCA's challenge to the stream buffer was addressed by the Staff and presented to the Planning Board at the hearing, and that "the core of Appellant's complaint is not that their issues were not properly heard and considered, it's that ultimately neither Technical Staff nor the Planning Board agreed with them."

Turning to WMCCA's third claim, Applicant asserts that the Planning Board's "finding that the Preliminary Plan satisfied the adequate public facilities test, in particular with regard to the Property's eligibility for a second sewer hookup facilitating two lots, is supported by substantial evidence of record and is in accordance with the law." Looking at the covenant specifically, the Applicant argues that the 125-foot stream buffer on the

25

Preliminary Plan "clearly complies" with the requirement in the Piney Branch Sewer Agreement to identify and dedicate a buffer corridor.

## B. Analysis

Upon reviewing § 50-35 of the Subdivision Regulations, we distill five major areas[6] that the Planning Board must examine before approving a preliminary plan for a subdivision:

1. "*Sediment control.* All preliminary plans and extensions of previously approved plans must provide for erosion and sediment control, in accordance with all applicable laws and regulations governing sediment control." Subdivision Regulations, § 50-35(j).

2. "*Adequate public facilities.* The Planning Board must not approve a preliminary plan of subdivision unless the Board finds that public facilities will be adequate to support and service the area of the proposed subdivision. Public facilities and services to be examined for adequacy include roads and public transportation facilities, sewerage and water service, schools, police stations, firehouses, and health clinics." Subdivision Regulations, § 50-35(k).

3. "*Relation to Master Plan.* In determining the acceptability of a preliminary plan submitted under this Chapter, the Planning Board must consider the applicable master plan, sector plan, or urban renewal plan. A preliminary plan must substantially conform to the applicable master plan, sector plan, or urban renewal plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant master plan, sector plan, or urban renewal plan recommendation no longer appropriate." Subdivision Regulations, § 50-35(l).

4. "*Forest Conservation.* If a forest conservation plan is required under Chapter 22A, the Board must not approve a preliminary plan or any extension until all requirements of that law for plan approval are satisfied. Compliance with a

---

[6] The five areas analyzed in the Planning Board's Resolution and the Staff Report seem to track, more closely, the requirements of the version of Chapter 50 that took effect on February 13, 2017, even though the Applicant elected to have her Preliminary Plan reviewed under the prior version. *See* Subdivision Regulations, § 4.2(D). The circuit court also seems to have relied on the new version of Chapter in setting forth six requirements for preliminary plan approval.

26

required forest conservation plan, including any plan reviewed on a preliminary or final basis, must be made a condition of any approved preliminary plan." Subdivision Regulations, §50-35(o).

5. "*Water quality*. If a water quality plan is required under Chapter 19, the Planning Board must not approve a preliminary plan or any extension until all requirements of Chapter 19 for plan approval are satisfied. Compliance with a required water quality plan, including any plan reviewed on a preliminary or final basis, must be made a condition of any approved preliminary plan." Subdivision Regulations, §50-35(o).

As was noted, our review of the Planning Board's factual findings is limited to determining if the record, as a whole, contains substantial evidence to support the Board's findings and conclusions. *See Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 84. Although our review of the Planning Board's legal conclusions is less deferential "[w]hen determining the validity of those legal conclusions . . . 'a degree of deference should often be accorded the position of the administrative agency' whose task it is to interpret the ordinances and regulations the agency itself promulgated." *Id.* (quoting *People's Counsel for Baltimore Cty. v. Surina*, 400 Md. 662, 682 (2007)).

WMCCA relies on *State of Maryland Commission on Human Relations v. Malakoff*, in support of its contention that the Planning Board was obligated to "resolve all significant conflicts in the evidence." 273 Md. 214, 229 (1974). In that case, a real estate agent and his company sought judicial review of an administrative determination of the Commission on Human Relations that they had engaged in racial discrimination in the leasing of an apartment to a prospective tenant. *Id.* at 216-17. The circuit court concluded that the failure by the agent and his company to consider the prospective tenant did not constitute racial discrimination, and the Commission and prospective tenant appealed. *Id.* at 217. In

27

support of their contention that the agent "engaged in discriminatory practices," the Commission and prospective tenant relied heavily on a factual finding that the agent failed to tell the prospective tenant of the landlord's willingness to consider the prospective tenant if he applied through "normal channels." *Id.* at 229. However, the Court of Appeals noted that the Commission neglected to determine the "vital" "complementary questions" of whether the prospective tenant was aware of this offer and whether "this fact was known" to the real estate agent. *Id.* Consequently, the Court of Appeals found that the Commission failed to resolve evidentiary considerations, as required under the Administrative Procedure Act, necessary to "justify the imposition of sanctions." *Id.*

*Malakoff* is easily distinguishable from the case before us. In contrast to the Commission's failure to comply with the Administrative Procedure Act in *Malakoff*, the Planning Board addressed the statutory requirements for approving the Preliminary Plan, *and* considered the arguments made by WMCCA beyond the statutory requirements of section 50-35 of the Subdivision Regulations. The Staff made recommendations and findings on these five major areas in its Staff Report and at the hearing. The Resolution noted that the Planning Board "considered the recommendations and findings of its Staff as presented in the hearing and as set forth in the Staff Report," and adopted and incorporated the Staff Report by reference.

In regard to WMCCA's challenges to the wetlands and stream buffers, we cannot say, after examining the Staff Report and the Planning Board's Resolution, that the record lacks substantial evidence to support the Planning Board's factual findings. The Planning Board found that the "Preliminary Plan provides the required stormwater and water quality

28

features to protect the watershed" and that the "Application avoids and protects the stream valley buffer and the wetland areas in a Category I Forest Conservation Easement."  The Planning Board relied not only on Staff recommendations,[7] but the recommendations of many other agencies.  In its Resolution, the Board stated, for example, that "the County has approved the Water Quality Inventory as required by the Special Protection Area in order to achieve the goals cited in the Master Plan[,]" and conditioned its approval on the Applicant complying with each of the recommendations set forth by MCDPS in its "Final Water Quality Inventory letter dated May 25, 2017."  As set forth in our factual background, the Staff Report identified and addressed WMCCA's challenges to the Preliminary Plan's stream buffer and wetlands calculations.  At the hearing, the Planning Board heard extensive testimony from WMCCA's witness (who was not qualified as an expert).  Accordingly, we do not accept  WMCCA's charge that the Planning Board failed to consider these issues, and to the extent that the Planning Board was required to interpret the Forest Conservation Law and Environmental Guidelines to determine the proper method of calculating the buffers, we defer to the Planning Board's determination. *See Maryland Dept. of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 120 (2016) ("[W]e must accord an agency great deference regarding factual questions involving scientific matters in its area of technical expertise." (citation omitted)).

---

[7] The Staff Report states that, "[a]s specified in Table 1, page 8 of the Environmental Guidelines, the stream buffer for a Use Class I/I-P stream is 100 feet."  Because the Watts Branch Stream is a Use Class I/I-P stream, Staff continued, the Applicant's proffered 125-foot stream buffer was accepted and approved.

As for the Piney Branch Sewer Agreement Covenant, we agree with the Planning Board that it was outside of the Board's scope of review to determine whether the Applicant complied with the actions "encouraged" by the covenant's terms. The Planning Board was required to do no more than determine whether the Preliminary Plan fulfilled the requirements of § 50-35 of the Subdivision Regulations.

## III.

### The Tree Variance

### A. The Parties' Arguments

In its final challenge to the Planning Board's decision, WMCCA contends that the "Applicant did not directly address [her] compliance with the statutory requirement that [she] show that denial of the tree variance would amount to an "unwarranted hardship[,]" and the "Board nevertheless overlooked this omission[.]" WMCCA argues that, although the Planning Board "actually addressed" the issue of the variance, it did so in an "improperly conclusory fashion." WMCCA notes that "Staff offered the view that the unwarranted hardship was that without the variance the Applicant could not pursue a two-lot subdivision of the Property," but argues that the Planning Board did not explain why variance denial would constitute "denial of reasonable and significant use of the Property." WMCCA urges us to use the standard for "unwarranted hardship" set forth in *Assateague Coastal Trust, Inc. v. Schwalbach*, 448 Md. 112 (2016), that "without a variance, the applicant would be denied a use of the property that is both significant and reasonable." In WMCCA's view, "a one-lot subdivision would be a reasonable and significant use of the Property," and "variance denial would not be a hindrance to that result."

30

The Planning Board responds that its approval of the Applicant's variance request to remove or impact five trees on the Property "was consistent with the law and based on substantial evidence in the record." According to the Planning Board, the Court of Appeals, in a series of cases involving Maryland's Critical Area Law, defined the term "unwarranted hardship" as "equivalent to the denial of reasonable and significant use of the property[.]" The Planning Board further argues that the Court, in subsequent decisions, clarified that the Board needed only consider the specific part of the property covered by the variance in determining whether the property owner would be denied reasonable and significant use. Thus, under the Planning Board's understanding of the "unwarranted hardship" standard, the Board "correctly determined that, without the variance, the Applicant would suffer the loss of a reasonable and significant use of the Property – namely, the ability to develop a second lot as would otherwise be permitted by applicable law."

The Applicant likewise asserts that the Planning Board's "approval of the Tree Variance was consistent with the law and based on substantial evidence in the record." In the Applicant's view, WMCCA is proposing that the measure for "what constitutes a reasonable and significant use . . . be what adjacent neighbors have come to consider as the reasonable and significant use of the Property." The Applicant asserts that such an approach "would have highly subjective and arbitrary results." The Applicant points to the "substantial evidence in the record that failure to grant the variance would preclude the second lot, including the Technical Staff Report, the Preliminary Forest Conservation Plan, and the Applicant's detailed Tree Variance request."

## B. Analysis

Section 22A-21 of the Forest Conservation Law provides that "[a]n applicant may request in writing a variance from [Chapter 22A] or any regulation adopted under it if the applicant shows that enforcement would result in unwarranted hardship." Forest Conservation Law, § 22A-21(a). The applicant for a variance must:

> (1) describe the special conditions peculiar to the property which would cause the unwarranted hardship;
> (2) describe how enforcement of [Chapter 22A] will deprive the landowner of rights commonly enjoyed by others in similar areas;
> (3) verify that State water quality standards will not be violated and that a measurable degradation in water quality will not occur as a result of granting the variance; and
> (4) provide any other information appropriate to support the request.

Forest Conservation Law, § 22A-21(b). While the variance "may only be granted" if it meets the "unwarranted hardship" criteria, the Board may not grant the variance if granting the request:

> (1) will confer on the applicant a special privilege that would be denied to other applicants;
> (2) is based on conditions or circumstances which result from actions by the applicant;
> (3) is based on a condition relating to land or building use, either permitted or nonconforming, on a neighboring property; or
> (4) will violate State water quality standards or cause measurable degradation in water quality.

Forest Conservation Law, § 22A-21(d).

The only variance criterion at issue in this appeal is whether the Applicant properly established that not being able to remove or impact the trees "would result in unwarranted hardship." Although the statute does not, as the parties point out, define "unwarranted hardship," the appellate courts have had occasion to consider the meaning of the phrase.

32

Recently, the Court of Appeals, in *Assateague Coastal Trust, Inc. v. Schwalbach*, examined

the "unwarranted hardship" standard in the context of the Critical Area law. 448 Md. 112,

117 (2016). The statute and local ordinance at issue defined "unwarranted hardship" to

mean that, "without a variance, an applicant would be denied reasonable and significant

use of the entire parcel or lot for which the variance is requested." *Id.* at 120. The Court

noted that it was "clear that the restriction must relate in some way to use of the 'entire'

property and that the deprivation must relate to something that is 'reasonable and

significant[.]'" *Id.* at 127. The Court was tasked, however, with determining whether an

applicant for a variance had to "demonstrate a denial of *all* reasonable and significant use

of the entire property, or . . . show a denial of *a* reasonable and significant use of the entire

property." *Id.* After examining the history of the term, the Court held as follows:

> [I]n order to establish an unwarranted hardship, the applicant has the burden
> of demonstrating that, without a variance, the applicant would be denied a
> use of the property that is both significant and reasonable. In addition, the
> applicant has the burden of showing that such a use cannot be accomplished
> elsewhere on the property without a variance.

*Id.* at 139.

We agree with the Planning Board and the Applicant that there was substantial

evidence in the record to support the Board's decision to grant the Applicant a tree variance.

The Planning Board found that, without the tree variance, the Applicant would not be able

to develop two lots, which is *a* use of the Subject Property that is significant and reasonable.

The Applicant also met her burden of showing that she could not accomplish the use

elsewhere, as the other environmental constraints precluded shifting the proposed lots. In

addition, the Planning Board determined that the Applicant's request did not violate any of

33

the prohibited conditions in § 22A-21(d).  We hold, therefore, that the Planning Board did not err in granting the Applicant's tree variance request.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0579s19cn.pdf